**No. 14-16449**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

MARJORIE KNOLLER,

Petitioner-Appellant,

v.

WALTER MILLER, Warden,
Valley State Prison for Women,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of California
District Court No, CV 12-00996 JST

**APPELLANT'S OPENING BRIEF**

DENNIS P. RIORDAN (SBN 69320)
dennis@riordan-horgan.com
DONALD M. HORGAN (SBN 121547)
don@riordan-horgan.com
RIORDAN & HORGAN
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile: (415) 552-2703

Attorneys for Petitioner-Appellant
MARJORIE KNOLLER

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

BAIL STATUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF EVIDENTIARY FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.     The State Court Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.     The Paucity of Evidence of Implied Malice. . . . . . . . . . . . . . . . 15

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.     Review of the District Court's Decision. . . . . . . . . . . . . . . . . . . 22

      B.     Review of the State Court's Substantive Decision.. . . . . . . . . . . . 22

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.     THE STATE APPELLATE COURT UNREASONABLY
       REJECTED PETITIONER'S CLAIM THAT THE TRIAL
       COURT'S ABSOLUTE PROHIBITION OF ANY DEFENSE
       INTERRUPTION, INCLUDING OBJECTIONS, DURING THE
       PROSECUTION'S REBUTTAL ARGUMENT CONSTITUTED
       STRUCTURAL ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      A.     Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Table of Contents continued**

1.   The Trial Court's Gag Orders and Expulsion Threats to Defense Counsel During Closing Argument. . . . . . . . . . . 25

2.   The Trial Court's Post-Hoc Explanation .. . . . . . . . . . . . . . . 29

3.   The First Decision on Appeal . . . . . . . . . . . . . . . . . . . . . . . . 30

4.   The Second Decision Appeal. . . . . . . . . . . . . . . . . . . . . . . . 33

B.   The Trial Court Violated Petitioner's Federal Constitutional Right to Counsel During Closing Argument, a Structural Error that is Reversible *Per Se*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.   Governing Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.   The Trial Court's Threats and Orders to Petitioner's Counsel Were Unwarranted. . . . . . . . . . . . . . . . . . . . . . . . . . 37

3.   The Sixth Amendment Violation Was Structural Error That Was Prejudicial Per Se. . . . . . . . . . . . . . . . . . . . . . . . . 39

C.   The State Court of Appeal's Decision Contravened and/or Unreasonably Applied Established Supreme Court Precedent and Was Based on an Unreasonable Determination of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.   The State Appellate Court Unreasonably Found the Trial Court's Orders and Expulsion  Threats "Ambiguous". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.   The State Appellate Court Contravened and/or Unreasonably Applied Supreme Court Precedent in Ruling that the Trial Court's Orders and Expulsion Threats Were a Proper Exercise of its Authority to Control the Courtroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Table of Contents continued**

3.    The State Appellate Court Unreasonably Applied Supreme Court Precedent in Determining that the Trial Court Did Not Deprive Petitioner of Counsel During A Critical Stage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    a.    The Plain Meaning of *Cronic*. . . . . . . . . . . . . . . . . . . 45

    b.    Subsequent Supreme Court Precedent. . . . . . . . . . . . . 48

4.    The District Court's Order . . . . . . . . . . . . . . . . . . . . . . . . . 55

II.    THE TRIAL COURT'S CONSTITUTIONAL ERROR IN PROHIBITING ANY DEFENSE INTERRUPTION, INCLUDING OBJECTIONS, DURING THE PROSECUTION'S REBUTTAL ARGUMENT HAD A SUBSTANTIAL AND INJURIOUS EFFECT UPON THE JURY'S VERDICT. . . . . . . . . . . . . . . . . . . . . . . . 56

    A.    This Court Independently Assesses the Prejudicial Effect of Federal Constitutional Error Under *Brecht*. . . . . . . . . . . . 56

    B.    The Trial Court's Orders and Expulsion Threats Were Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# TABLE OF AUTHORITIES

## CASES

*Ali v. Hickman,*
584 F.3d 1174 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Arizona v. Fulminante,*
499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bartlett v. Alameida,*
366 F.3d 1020 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Bell v. Cone,*
535 U.S. 685 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Brecht v. Abrahamson,*
507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Chapman v. California,*
386 U.S. 18 (1967).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Cooper v. Superior Court,*
55 Cal.2d 291 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*Curtis v. Duval*
124 F.3d 1 (1st Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Dunn v. United States,*
442 U.S. 100 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fay v. Noia,*
372 U.S. 391 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Frantz v. Hazey,*
533 F.3d 724 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**Table of Authorities continued**

*Frost v. Van Boening*,
757 F.3d 910 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Fry v. Pliler*,
551 U.S. 112 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Gallagher v. Municipal Court*,
31 Cal.2d 784 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Geders v. United States*,
425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Gideon v. Wainwright*,
372 U.S. 335 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Glebe v. Frost*,
135 S.Ct. 429 (November 17, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Hamilton v. Alabama*,
368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Harrington v. Richter*,
131 S.Ct. 770 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Herring v. New York*,
422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 43

*Holt v. Virginia*,
381 U.S. 131 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45

*Kotteakos v. United States*,
328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**Table of Authorities continued**

*Merolillo v. Yates,*
663 F.3d 444 (9th Cir.2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

*Mickens v. Taylor,*
535 U.S. 162 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 55

*Miller-El v. Cockrell,*
537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Moore v. Dempsey,*
261 U.S. 86 (1923).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Morris v. State of California,*
945 F.2d 1456 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Musladin v. Lamarque,*
555 F.3d 830 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 52, 56

*Neder v. United States,*
527 U.S. 1 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 53

*O'Neal v. McAninch,*
513 U.S. 432 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Panetti v. Quarterman,*
551 U.S. 930 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Bloom,*
48 Cal.3d 1194 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Carrera,*
49 Cal.3d 291 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*People v. Fields,*
35 Cal.3d 329 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**Table of Authorities continued**

*People v. Green,*
27 Cal.3d 1 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Knoller,*
41 Cal.4th 139 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*People v. Stansbury,*
4 Cal.4th 1017 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*People v. Vance,*
188 Cal.App.4th 1182 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*People v. Visciotti,*
2 Cal.4th 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*People v. Wade,*
43 Cal.3d 366 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Powell v. Alabama,*
287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sacher v. United States,*
343 U.S. 1 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 43

*Satterwhite [v. Texas,*
486 U.S. 249 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Sheppard v. Maxwell,*
384 U.S. 333 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Musladin v. Lamarque,*
555 F.3d 830 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Singh v. Prunty,*
142 F.3d 1157 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**Table of Authorities continued**

*State of Arizona v. Shamrock Foods Co.,*
729 F.2d 1207 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Steagald v. United States,*
451 U.S. 204 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Strickland v. Washington,*
466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 53

*Taylor v. Maddox,*
366 F.3d 992 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 42, 43, 48

*United States v. Cronic,*
466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Gonzalez-Lopez,*
548 U.S. 140 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 52, 54

*United States v. McCormick,*
500 U.S. 257 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*White v. Maryland,*
373 U.S. 59 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Williams v. Taylor,*
529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATUTES

28 U.S.C. § 2253(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

28 U.S.C. § 2254(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 42, 48, 54

**Table of Authorities continued**

Pen. Code, § 187. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pen. Code, § 192, subd. (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pen. Code, § 399. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Penal Code §654. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

## INTRODUCTION

"Habeas corpus is a guard against extreme malfunctions in the state criminal justice systems...." *Harrington v. Richter*, 562 U.S. __, 131 S.Ct. 770, 786 (2011). This is such a case.

On January 26, 2001, one of the dogs owned by Ms. Knoller and her co-defendant husband, Robert Noel, fatally mauled Diane Whipple, a neighbor who lived on the same floor of the defendants' San Francisco apartment building. This gruesome tragedy occurred when Ms. Knoller left her apartment to take the dog to the roof of her building to walk it. The state conceded Ms. Knoller had not intended to cause Ms. Whipple's death, the men rea element of expressed malice murder. There was no evidence introduced at trial that a dog being walked by his or her owner had ever killed another party. There was none that Ms. Knoller, an attorney, undertook the walk despite realizing it might result in the demise of another human being, the mens rea required for implied malice murder. Indeed, there was no evidence that Ms. Knoller knew she would encounter Ms. Whipple or anyone else on the walk to and from the roof. Never before in California had an owner been prosecuted for murder based on an accidental death caused by his or her dog.

Given the horrifying circumstances of Ms. Whipple's death, however, Noel and Knoller were subjected to intense scrutiny and criticism by the San Francisco media. In the wake of that avalanche of prejudicial publicity, after announcing that he would not seek to obtain a murder indictment in the case, the San Francisco

1

District Attorney did just that.

It is never more difficult to achieve a fair trial than in cases attended by white-hot public hostility towards the accused. Under the circumstances, the conduct of petitioner's state court trial cried out for rigorous adherence to the rule of law and strict enforcement of the protections to which criminal defendants are entitled under the federal constitution. *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (stating that highly publicized murder case, "it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion"). Yet Ms. Knoller's trial was marred by a shocking act of judicial misconduct resulting in a deprivation of Ms. Knoller's Sixth Amendment right to counsel at the most critical stage of her trial: the rebuttal section of the prosecution's closing argument. After Ms. Knoller's counsel made wholly appropriate objections to the prosecution's claims, the trial court first threatened defense counsel with expulsion from the courtroom, *and then jail*, if she as much as rose to make another objection. The deputy district attorney was then free to engage in, and did commit, a patent and grossly prejudicial violation of the universally recognized "Golden Rule" forbidding pleas to jurors to put themselves in the shoes of the victim.

The issue before this Court is not whether the conduct of the trial judge and prosecutor was ethically permissible—it was not—or whether Ms. Knoller was deprived of her constitutional right to counsel at a critical stage of the trial— she was. Thus, although it denied habeas relief, the district court found the trial

judge's conduct "erroneous and inappropriate." Rather, this Court is called upon to decide both the legal standard to be applied in deciding the issue of prejudice—that of per se reversal for structural error or that of "substantial and injurious effect" under *Brecht v. Abrahamson*, 507 U.S. 619 (1993)—as well as whether a new trial is required under either measure. There has never been a weaker implied malice murder case prosecuted in this state. Under either standard of constitutional review, the deprivation of Ms. Knoller's rights to counsel and a fair trial merit federal habeas relief.

## STATEMENT OF JURISDICTION

This court has jurisdiction to review the final order and judgment of the district court issued on July 3, 2014, pursuant to 28 U.S.C. § 2253(a). The order contained a certificate of appealability as to the denial of counsel claims that petitioner advances here. Petitioner filed a timely notice of appeal on July 29, 2014.

## BAIL STATUS

Ms. Knoller is incarcerated and is presently serving a term of fifteen years to life in the California state prison.

/ /

/ /

/ /

/ /

/ /

3

## ISSUES PRESENTED[1]

I. **DID THE STATE COURTS REASONABLY REJECT PETITIONER'S CLAIM THAT THE TRIAL COURT'S ABSOLUTE PROHIBITION OF ANY DEFENSE INTERRUPTION, INCLUDING OBJECTIONS, DURING THE PROSECUTION'S REBUTTAL ARGUMENT CONSTITUTED STRUCTURAL ERROR UNDER CLEARLY ESTABLISHED SUPREME COURT PRECEDENT?**

II. **DID THE TRIAL COURT'S CONSTITUTIONAL ERROR IN PROHIBITING ANY DEFENSE INTERRUPTION, INCLUDING OBJECTION, DURING THE PROSECUTION'S REBUTTAL ARGUMENT EXERT A SUBSTANTIAL AND INJURIOUS EFFECT UPON THE JURY'S VERDICT?**

## STATEMENT OF THE CASE

On March 27, 2001, a grand jury sitting in San Francisco, California, indicted defendant-petitioner Knoller in Count One with murder (Pen. Code, § 187), in Count Two with involuntary manslaughter (Pen. Code, § 192, subd. (b)), and in Count Three with ownership of a mischievous animal causing death (Pen. Code, § 399) in connection with a fatal dog-mauling incident that occurred on January 21, 2001. The indictment charged her codefendant, Robert Noel, with the latter two offenses. (CT 1043-1044)[2]  The trial judge, James Warren, granted defendants' motion for change of venue and ordered the trial to be held in Los Angeles County.  (CT 3626, 3690)

---

[1]  Issues I and II, as presented here, are encompassed within the general issue that the district court certified for appeal.  (ER 45)

[2]  "CT" refers to the Clerk's Transcript and "RT" to the Reporter's Transcript generated in connection with petitioner's initial state court appeal.  "CT II" refers to the Clerk's Transcript and "RT II" to the Reporter's Transcript generated in connection with petitioner's second state court appeal.

4

On February 15, 2002, a jury was sworn. (CT 4391) On March 21, 2002, the jury found defendants guilty on all counts. (CT 4501-4502, 4601-4602, 4683)

Knoller and Noel thereafter filed motions for a new trial. (CT 4752, 4774, 4864, 5037) On June 17, 2002, Judge Warren granted Knoller's motion as to the charge of second degree murder. The judge, having heard all of the evidence, including the testimony of Ms. Knoller herself, concluded that Ms. Knoller had not contemplated and disregarded a high probability that her actions on January 21, 2001 would cause another to die, and therefore had not acted with the implied malice required for a conviction of second degree murder. (CT 5103; see *People v. Knoller*, 41 Cal.4th at 149-151 (2007) (recounting trial court's statement's at time of ruling) The motions were otherwise denied. (CT 5103) The trial court sentenced Noel to serve four years in prison for involuntary manslaughter. (CT 5104) On June 18, 2002, Noel filed a notice of appeal. (CT 5108)

On July 3, 2002, the state appealed from the order granting Knoller a new trial on the murder charge. (CT 5114) On July 15, 2003, the trial court sentenced Knoller to four years in prison for the involuntary manslaughter conviction on Count Two. The court stayed its three-year sentence as to the §399 conviction pursuant to Penal Code §654. (CT 5141) That same day, Knoller appealed the judgment against her. (CT 5146)

The Court of Appeal thereafter consolidated the parties' appeals. On May 5, 2005, that court issued a decision that reversed Judge Warren's order granting Ms. Knoller a new trial on the murder conviction, reasoning that the legal

5

definition of implied malice, as applied by Judge Warren, was legally incorrect. In straining to reach the result it desired over a vigorous dissent, the majority coined a novel definition of implied malice murder never before used in a California murder case. The appellate court affirmed the judgment against Ms. Knoller on the remaining counts and remanded the matter to the trial court for further proceedings consistent with its opinion. (ER 278) The manslaughter judgment against Mr. Noel was affirmed. (*Id.*)

Ms. Knoller thereafter sought review of the California Court of Appeal's decision in the California Supreme Court. On June 27, 2005, the Supreme Court granted the petition. On May 31, 2007, the Court unanimously issued a decision disapproving the Court of Appeal majority's attempted dilution of the elements of malice murder and remanding the case to that court with directions that it return the case to the trial court for reconsideration of defendant's new trial motion in accordance with the Supreme Court's views as to the correct definition of implied malice. *People v. Knoller*, 41 Cal.4th 139, 159 (2007)

In the meantime, Ms. Knoller completed the state prison term imposed for her manslaughter conviction and, after her release on parole, moved to care for her mother in Florida, where she found work and otherwise lived without incident. While in Florida, Ms. Knoller successfully completed her parole. (CT 448)

In November 2007, the Court of Appeal transferred the matter to the San Francisco Superior Court for reconsideration of Ms. Knoller's motion for a new trial as to the murder conviction. (CT [II] 1) At the initial hearings in that court,

6

Superior Court/assignment Judge Kay Tsenin indicated that the case would likely be reassigned to Judge Warren, who, subsequent to the initial trial, had retired but remained actively employed at Judicial Arbitration and Mediation Services ("JAMS"). (CT [II] 147-153) However, on April 11, 2008, over Ms. Knoller's objection, presiding Superior Court Judge David Ballati reassigned the matter to acting judge Charlotte Woolard. (CT [II] 189) Judge Woolard had never viewed the trial witnesses or heard their testimony.

Following briefing and oral argument, on August 22, 2008, Judge Woolard denied the motion for a new trial. (CT [II] 416) At a sentencing hearing on September 22, 2008, Judge Woolard denied Ms. Knoller's request for probation and sentenced her to a term of 15 years to life in the state prison, with credit to be given for the prison term Ms. Knoller had previously served for her involuntary manslaughter conviction. Notwithstanding Ms. Knoller's flawless performance while on released on parole, Judge Woolard remanded her immediately into custody. (CT [II] 478-479)

Ms. Knoller appealed from the superior court's order and judgment. (CT [II] 484) On August 20, 2010, after the conclusion of appellate briefing, the Court of Appeal issued its decision affirming the judgment in full. (ER 47-149) Ms. Knoller sought review of the Court of Appeal's decision by timely filing a petition in the California Supreme Court. That Court denied the petition in an order issued on December 1, 2010. (ER 297)

On February 27, 2012, Ms. Knoller filed a timely, verified petition for a writ

7

of habeas corpus in the federal district court (Dkt. 1), following which that court issued an order to show cause (Dkt. 3).

On July 3, 2014, after the conclusion of substantive briefing by the parties, district court Judge Jon S. Tigar issued an order (ER 1-46) and judgment (ER 294-95) denying relief.  Judge Tigar issued a certificate of appealability as to the right of counsel issue petitioner addresses in Arguments I and II, below.  (ER 45-46) Ms. Knoller timely appealed from the judgment on July 29, 2014.  (ER 294-95)

## STATEMENT OF EVIDENTIARY FACTS

Defendant Knoller here presents the summary of the evidence contained in the Supreme Court's opinion in *People v. Knoller*, at 41 Cal.4th 139 (2007). Additional facts and citations to the record are set forth in connection with the arguments presented below.

### A.    The State Court Opinion

> In 1998, Pelican Bay State Prison inmates Paul Schneider and Dale Bretches, both members of the Aryan Brotherhood prison gang, sought to engage in a business of buying, raising, and breeding Presa Canario dogs.   This breed of dog tends to be very large, weighing over 100 pounds, and reaching over five feet tall when standing on its hind legs.   A document found in defendants' apartment describes the Presa Canario as "a gripping dog ... [¶] ... always used and bred for combat and guard ... [and] used extensively for fighting...."
>
> Prisoners Schneider and Bretches relied on outside contacts, including Brenda Storey and Janet Coumbs, to carry out their Presa Canario business.   Schneider told Coumbs that she should raise the dogs.
>
> As of May 1998, Coumbs possessed four such dogs,

8

named Bane, Isis, Hera, and Fury. Hera and Fury broke out of their fenced yard and attacked Coumbs's sheep. Hera killed at least one of the sheep and also a cat belonging to Coumbs's daughter. Coumbs acknowledged that Bane ate his doghouse and may have joined Fury in killing a sheep.

Defendants Knoller and Noel, who were attorneys representing a prison guard at Pelican Bay State Prison, met inmate Schneider at the prison sometime in 1999. In October 1999, defendants filed a lawsuit on behalf of Brenda Storey against Coumbs over the ownership and custody of the four dogs. Coumbs decided not to contest the lawsuit and to turn the dogs over to defendants. Coumbs warned Knoller that the dogs had killed Coumbs's sheep, but Knoller did not seem to care.

Defendant Knoller thereafter contacted Dr. Donald Martin, a veterinarian for 49 years, and on March 26, 2000, he examined and vaccinated the dogs. With his bill to Knoller, Dr. Martin included a letter, which said in part: "I would be professionally amiss [*sic* ] if I did not mention the following, so that you can be prepared. These dogs are huge, approximately weighing in the neighborhood of 100 pounds each. They have had no training or discipline of any sort. They were a problem to even get to, let alone to vaccinate. You mentioned having a professional hauler gather them up and taking them.... Usually this would be done in crates, but I doubt one could get them into anything short of a livestock trailer, and if let loose they would have a battle. [¶] To add to this, these animals would be a liability in any household, reminding me of the recent attack in Tehama County to a boy by large dogs. He lost his arm and disfigured his face. The historic romance of the warrior dog, the personal guard dog, the gaming dog, etc. may sound good but hardly fits into life today." Knoller thanked Dr. Martin for the information and said she would pass it on to her client.

In April 1, 2000, both defendants and a professional dog handler took custody of the dogs from Coumbs. Bane then weighed 150 pounds and Hera 130 pounds. Coumbs told both defendants that she was worried about

9

the dogs, that Hera and Fury should be shot, and that she was also concerned about Bane and Isis.

Hera remained for a short time at a kennel in San Mateo County while Bane was sent to a facility in Los Angeles County. Both defendants soon became concerned for the health of the two dogs. On April 30, 2000, defendants brought Hera to their sixth-floor apartment at 2398 Pacific Avenue in San Francisco. Bane arrived in September 2000. Codefendant Noel purchased dog licenses, registering himself and Knoller as the dogs' owners.

A later search of defendants' apartment showed that they frequently exchanged letters with Pelican Bay inmates Schneider and Bretches. Over 100 letters were sent and received between March and December 2000, apparently under the guise of attorney-client correspondence. In the letters, defendants discussed a commercial breeding operation, considering various names such as GuerraHund Kennels, Wardog, and finally settling on Dog-O-War. Prisoners Schneider and Bretches' notes on a Web site for the business described Bane as "Wardog," and "Bringer of Death: Ruin: Destruction."
.
Between the time defendants Noel and Knoller brought the dogs to their sixth-floor apartment in San Francisco and the date of the fatal mauling of Diane Whipple on January 26, 2001, there were about 30 incidents of the two dogs being out of control or threatening humans and other dogs. Neighbors mentioned seeing the two dogs unattended on the sixth floor and running down the hall. Codefendant Noel's letters to prisoner Schneider confirmed this, mentioning one incident when defendant Knoller had to let go of the two dogs as they broke from her grasp and ran to the end of the hall. Noel described how the dogs even pushed past him and "took off side by side down the hall toward the elevator in a celebratory stampede!! 240 lbs. of Presa wall to wall moving at top speed!!!" In a letter to inmate Schneider, defendant Knoller admitted not having the upper body strength to handle Bane and having trouble controlling Hera.

When neighbors complained to defendants Noel and

10

Knoller about the two dogs, defendants responded callously, if at all. In one incident, neighbors Stephen and Aimee West were walking their dog in a nearby park when Hera attacked their dog and "latched on" to the dog's snout. Noel was unable to separate the dogs, but Aimee threw her keys at Hera, startling Hera and causing Hera to release her grip on the Wests' dog. On another day, Stephen West was walking his dog when he encountered Noel with Bane. Bane lunged toward West's dog, but Noel managed to pull Bane back. When Stephen West next saw Noel, West suggested that Noel muzzle the dogs and talk to dog trainer Mario Montepeque about training them; Noel replied there was no need to do so. Defendants Knoller and Noel later encountered Montepeque, who advised defendants to have their dogs trained and to use a choke collar. Defendants disregarded this advice. On still another occasion, when dog walker Lynn Gaines was walking a dog, Gaines told Noel that he should put a muzzle on Bane; Noel called her a "bitch" and said the dog Gaines was walking was the problem.

There were also instances when defendants' two dogs attacked or threatened people. David Moser, a fellow resident in the apartment building, slipped by defendants Knoller and Noel in the hallway only to have their dog Hera bite him on the "rear end." When he exclaimed, "Your dog just bit me," Noel replied, "Um, interesting." Neither defendant apologized to Moser or reprimanded the dog. Another resident, Jill Cowen Davis, was eight months pregnant when one of the dogs, in the presence of both Knoller and Noel, suddenly growled and lunged toward her stomach with its mouth open and teeth bared. Noel jerked the dog by the leash, but he did not apologize to Davis. Postal carrier John Watanabe testified that both dogs, unleashed, had charged him. He said the dogs were in a "snarling frenzy" and he was "terrified for [his] life." When he stepped behind his mail cart, the dogs went back to Knoller and Noel. On still another occasion, the two dogs lunged at a six-year-old boy walking to school; they were stopped less than a foot from him.

One time, codefendant Noel himself suffered a severe

11

injury to his finger when Bane bit him during a fight with another dog. The wound required surgery, and Noel had to wear a splint on his arm and have two steel pins placed in his hand for eight to 10 weeks.

Mauling victim Diane Whipple and her partner Sharon Smith lived in a sixth-floor apartment across a lobby from defendants. Smith encountered defendants' two dogs as often as once a week. In early December 2000, Whipple called Smith at work to say, with some panic in her voice, that one of the dogs had bitten her. Whipple had come upon codefendant Noel in the lobby with one of the dogs, which lunged at her and bit her in the hand. Whipple did not seek medical treatment for three deep, red indentations on one hand. Whipple made every effort to avoid defendants' dogs, checking the hallway before she went out and becoming anxious while waiting for the elevator for fear the dogs would be inside. She and Smith did not complain to apartment management because they wanted nothing to do with defendants Knoller and Noel.

On January 26, 2001, Whipple telephoned Smith to say she was going home early. At 4:00 p.m., Esther Birkmaier, a neighbor who lived across the hall from Whipple, heard dogs barking and a woman's "panic-stricken" voice calling, "Help me, help me." Looking through the peephole in her front door, Birkmaier saw Whipple lying facedown on the floor just over the threshold of her apartment with what appeared to be a dog on top of her. Birkmaier saw no one else in the hallway. Afraid to open the door, Birkmaier called 911, the emergency telephone number, and at the same time heard a voice yelling, "No, no, no" and "Get off." When Birkmaier again approached her door, she could hear barking and growling directly outside and a banging against a door. She heard a voice yell, "Get off, get off, no, no, stop, stop." She chained her door and again looked through the peephole. Whipple's body was gone and groceries were strewn about the hallway. Birkmaier called 911 a second time.

At 4:12 p.m., San Francisco Police Officers Sidney Laws and Leslie Forrestal arrived in response to Birkmaier's

12

telephone calls. They saw Whipple's body in the hallway; her clothing had been completely ripped off, her entire body was covered with wounds, and she was bleeding profusely. Defendant Knoller and the two dogs were not in sight.

The officers called for an ambulance. Shortly thereafter, defendant Knoller emerged from her apartment. She did not ask about Whipple's condition but merely told the officers she was looking for her keys, which she found just inside the door to Whipple's apartment.

An emergency medical technician administered first aid to Whipple, who had a large, profusely bleeding wound to her neck. The wound was too large to halt the bleeding, and Whipple's pulse and breathing stopped as paramedics arrived. She was revived but died shortly after reaching the hospital.

An autopsy revealed over 77 discrete injuries covering Whipple's body "from head to toe." The most significant were lacerations damaging her jugular vein and her carotid artery and crushing her larynx, injuries typically inflicted by predatory animals to kill their prey. The medical examiner stated that although earlier medical attention would have increased Whipple's chances of survival, she might ultimately have died anyway because she had lost one-third or more of her blood at the scene. Plaster molds of the two dogs' teeth showed that the bite injuries to Whipple's neck were consistent with Bane's teeth.

Animal control officer Andrea Runge asked defendant Knoller to sign over custody of the dogs for euthanasia. Knoller, whom Runge described as "oddly calm," agreed to sign over Bane, but she refused to sign over Hera for euthanasia and she refused to help the animal control officers with the animals, saying she was "unable to handle the dogs." When tranquilizer darts malfunctioned and failed to quiet Bane, "come-along" poles were used by animal control officers backed up by officers with guns drawn. Hera too was controlled by officers with "come-along" poles.

13

On February 8, 2001, both defendants appeared on the television show *Good Morning America* and basically blamed mauling victim Whipple for her own death. Defendant Knoller claimed that Whipple had already opened her apartment door when something about her interested Bane. He broke away, pulled Knoller across the lobby, and jumped up on Whipple, putting his paws on either side of her. Knoller said she pushed Whipple into Whipple's apartment, fell on top of Whipple, and then tried to shield Whipple with her own body. But Whipple's struggles must have been misinterpreted by the dog, and when Whipple struck Knoller with her fist, the dog began to bite Whipple. Knoller claimed that Whipple had ample opportunity to just slam the door of her apartment or stay still on the floor.

Codefendant Noel did not testify, but he presented evidence of positive encounters between the two dogs and veterinarians, friends, and neighbors. Defendant Knoller did testify in her own defense. She referred to herself, her husband, and Pelican Bay prisoner Schneider as the "triad," and she spoke of Schneider as her "son." The two dogs had become a focal point in the relationship. She denied reading literature in the apartment referring to the vicious nature of the dogs. She thought the dogs had no personality problems requiring a professional trainer. She denied receiving or otherwise discounted any warnings about the two dogs' behavior and she maintained that virtually all the witnesses testifying to incidents with the dogs were lying. She said she never walked both dogs together. Ordinarily, she would walk Hera and codefendant Noel would walk Bane, because she had insufficient body strength to control Bane. But after Noel was injured while breaking up a fight between Bane and another dog, Knoller would sometimes walk Bane, always on a leash. She said she had just returned from walking Bane on the roof of the apartment building, and had opened the door to her apartment while holding Bane's leash, when Bane dragged her back across the lobby toward Whipple, who had just opened the door to her own apartment. The other dog, Hera, left defendants' apartment and joined Bane, who attacked Whipple. Knoller said she threw herself on Whipple to save her. She denied that Hera

14

participated in the attack.   She acknowledged not calling
911 to get help for Whipple.

Asked whether she denied responsibility for the attack
on Whipple, Knoller gave this reply:  "I said in an
interview that I wasn't responsible but it wasn't for the-it
wasn't in regard to what   Bane had done, it was in regard
to knowing whether he would do that or not.   And I had
no idea that he would ever do anything like that to
anybody.   How can you anticipate something like that?
It's a totally bizarre event.   I mean how could you
anticipate that a dog that you know that is gentle and
loving and affectionate would do something so horrible
and brutal and disgusting and gruesome to anybody?
How could you imagine that happening?"

In rebuttal, the prosecution presented evidence that the
minor character of defendant Knoller's
injuries-principally bruising to the hands-indicated that
she had not been as involved in trying to protect mauling
victim Whipple as she had claimed.   Dr. Randall
Lockwood, the prosecution's expert on dog behavior,
testified that good behavior by a dog on some occasions
does not preclude aggressive and violent behavior on
other occasions, and he mentioned the importance of
training dogs such as Bane and Hera *not* to fight".

*Knoller*, 41 Cal.4th at 144-149.

## B.    The Paucity of Evidence of Implied Malice

The facts set forth in the state Supreme Court's summary do not adequately

convey the paucity of evidence that Ms. Knoller acted with implied malice under

California law, i.e., that at the time she opened the door of her apartment, she

actually appreciated and disregarded the risk *to human life* posed by that very act.

Again, Diane Whipple was mauled to death while returning to her apartment

late in the afternoon on January 26, 2001. Knoller, who lived down the hallway

from Whipple, testified that the homicide occurred when she was returning from

15

walking Bane, who broke loose from her control while she was opening her apartment door, and then was joined in the assault on Whipple by Hera. The state argued at trial that Knoller also took Hera out on the walk without either a leash or muzzle. There is absolutely no evidence in the record that Hera was initially taken on the walk, as opposed to escaping into the hallway when Bane returned and began to attack Ms. Whipple, but, as will become clear, that factual dispute has no bearing on issues presented here.

The prosecutor emphasized in his closing argument that Ms. Knoller could not be convicted of murder on a theory of express malice—i.e., that she intended to kill Diane Whipple or anyone else. (ER 322: "No intent to kill;" ER 326: "no intent to kill is required so put that off the table, that is not what this case is about.") The state's legal theory of murder liability was solely that of implied malice. In order to act with implied malice, Ms. Knoller had to have known that her "conduct endanger[ed the life of another and . . . act[ed] with conscious disregard for life." *People v. Knoller*, 41 Cal.4th at 152. "[A] killer acts with implied malice only when acting with an awareness of *endangering human life.*" *Id.* at 153, italics in original.

Rather than face the difficulty of proving that defendant Knoller acted with implied malice during her dogs' assault on Diane Whipple in the hallway of the apartment house where both Knoller and Whipple lived, however, the prosecution chose to entirely forego any contention that Knoller acted with conscious disregard for Whipple's life at that time. For tactical reasons, it rested its Count

16

One murder charge on the factual theory that Knoller committed the act and possessed the mental state required for a second degree murder conviction *before* she left her apartment on January 26, 2001. Prosecutor Hammer constantly emphasized in closing argument that his theory of implied malice liability on the murder charge was limited to events occurring before Knoller entered her hallway to begin the dog walk:

> By the time you go out in the hallway with these two monsters, those 240 pounds of dog with these teeth (indicating) which they saw everyday often lunging at people, by the time she walked into that hallway intentionally without adequate restraint, no choke collar, no shock collar, no anything else she had been told to use and no muzzle, by the time she went into that hallway and the dogs broke loose like they had done many times before, it was too late.
>
> The defense put on most of their case about friendly dog witnesses . . . and about what a hero Marjorie Knoller was. That's all irrelevant. *By the time she committed that intentional act of going in the hallway with two dogs, if you believe her on anything, one dog with no muzzle and no restraint with this dog (indicating) knowing what it would do, the crime was complete.*

(ER 320-21) (emphasis added)

> Under the law, if you find that Marjorie Knoller acted in conscious disregard when she left in that hallway that day without muzzles, without proper restraints knowing what these dogs could do, then you find implied malice and under the law, implied malice equals second degree murder.

(ER 322)

Mr. Hammer again and again reiterated that the "intentional act" on which he rested his murder case against Knoller was "[g]oing into the hallway with two

17

dogs without muzzles, without proper restraint on the dogs" (ER 325; *see also* ER 359), and that the mental state at issue was "you knew of the danger and acted in conscious disregard. *That's the mental state before you went out into the hallway*." (ER 326)  Given the theory on which he had rested his case, the prosecutor strenuously contended that any conduct or mental state of Knoller once she was in the hallway was "irrelevant to the issue under implied malice murder." (ER 354) "The heart of implied malice murder, ladies and gentlemen, is not what happened after the dog started the attack. It's too late."  (ER 356)  "The heart of implied murder you now know is knowledge, what did you know before January 26th when you intentionally went out into that hallway. . . ."  (ER 360)

Given this tactical election before the jury of a single intentional act as the basis for murder liability, the state was precluded on both constitutional[3] and equitable estoppel grounds[4] from arguing that Knoller's conviction on the Count

_____

[3] A reviewing court's assessment of the evidence is controlled by the factual theory on which the prosecution presented its case to the jury; as the United States Supreme Court has held, if the evidence is insufficient to support that specific theory, the jury's verdict cannot be sustained on any other ground.  *Dunn v. United States*, 442 U.S. 100, 107 (1979) (appellate cannot affirm a criminal conviction on different factual theory than one on which prosecution relied at trial, even if alternate theory is supported by the evidence); *see also United States v. McCormick*, 500 U.S. 257, 270 n.8 (1991) ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.")

[4] "A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second

18

One murder charge could be supported by evidence of an *actus reus* occurring, or a *mens rea* formed, after she left her apartment on January 26th to walk one or both of the dogs. In assessing the strength of the state's implied malice case, this Court must consider the presence or absence of evidence that Knoller was aware of, and consciously disregarded, the danger to life presented by her act of leaving her apartment to walk her dog.

The matters of record relevant to that issue are:

1. The prosecution introduced no evidence that prior to January 26th, Bane or Hera had ever caused the death of a human on a dog walk or in any other circumstance.

2. The prosecution introduced no evidence that any member of the Presa Canario breed had ever caused the death of a human being under any circumstance.

3. The prosecution introduced no evidence that a dog of any breed had ever caused the death of a human while being walked by, or in the presence of, its owner.

4. Ms. Knoller testified under oath that she had no idea that a death could result from walking Bane and/or Hera, and Judge Warren, the trial judge, while

---

claim inconsistent with his earlier contention." *State of Arizona v. Shamrock Foods Co.*, 729 F.2d 1207, 1215 (9th Cir. 1984); *see also Morris v. State of California*, 945 F.2d 1456, 1459 (9th Cir. 1991)(quoting same); *Steagald v. United States,* 451 U.S. 204, 209-211 (1981) ("the Government through its assertions, concessions, and acquiescence, has lost its right to challenge [petitioner's] assertion").

19

evaluating her testimony skeptically, expressed his absolute conviction that in this respect it was truthful: "[Y]ou said that you had no idea that this dog could do what he did and pounded the table. I believed you." (ER 307) It was on this basis that Judge Warren granted petitioner's motion for a new trial as to her murder conviction on the ground that the evidence had not established that Ms. Knoller acted with malice aforethought in leaving her apartment with her dog.

The only evidence bearing on the issue of fatalities occurring during dog walks by owners came from Doctor Lockwood, the prosecution's expert, one of the country's leading authorities on the epidemiology of fatal dog bites, which he had studied since 1972. (RT 5152) Lockwood testified that in the more than 300 dog-caused fatalities that he had studied over that period, there never had been a case, as here, "of a healthy adult young woman who has been killed by a dog when the owner is present. Usually the presence of the owner has been sufficient to prevent the attack." (RT 5191)

## SUMMARY OF ARGUMENT

First, in the 2005 opinion which proved dispositive of the Sixth Amendment claim,[5] the state Court of Appeal majority held that in preventing trial counsel from interrupting in any way during the prosecutor's closing argument, indisputably a critical stage of trial, the court had not committed prejudicial error

---

[5] As will be established below, although Ms. Knoller's petition challenged the second opinion of the Court of Appeal in 2010, the ruling on the Sixth Amendment issue in that opinion was completely controlled by the majority's decision of that question in the earlier 2005 opinion.

of any kind. But, as the original dissent made crystal clear, the United States Supreme Court has repeatedly stated that a court-imposed deprivation of a defendant's right to counsel during a critical stage of a trial, as occurred here, is structural error that merits reversal *per se*. The state court unreasonably refused to invoke that rule or to apply its underlying analysis.

*Second*, after rejecting petitioner's claim of structural error, the state appellate majority ruled that, considered as constitutional error subject to harmless error analysis, the silencing of Knoller's counsel had not triggered sufficient prejudice to warrant reversal. Even if a harmlessness inquiry is appropriate, the state court's ruling on issue was utterly unpersuasive given that (a) the trial court's orders and threats of expulsion and incarceration patently denigrated counsel and with it, the defense case itself; (b) the orders gave the prosecutor free rein to launch his improper and highly inflammatory argument urging jurors to imagine themselves in the victim's place as the fatal mauling occurred; and © of great importance, the prosecution had produced no substantial evidence supporting the murder theory on which the prosecution founded its case, i.e., that Ms. Knoller had *recognized* and *consciously disregarded the risk to human life* caused by her opening the door to her apartment the moment before Ms. Whipple died.

The state majority's claim that a Sixth Amendment violation could be harmless in this case reflected its desire to breach a preordained result, despite law and logic to the contrary. *Compare Fay v. Noia*, 372 U.S. 391, 428 (1963) ("[A] mob-dominated trial is no less a denial of due process because the State Supreme

21

Court believed that the trial was actually a fair one," (citing and summarizing the principle stated by Justice Holmes in his majority opinion in *Moore v. Dempsey,* 261 U.S. 86 (1923)). In any event, this Court independently reviews the question of prejudice under *Brecht v. Abrahamson*, *supra,* 507 U.S. 619, i.e., without regard to the state's harmlessness analysis. Fairly conducted, such a review compels the conclusion that habeas relief is warranted here.

## STANDARD OF REVIEW

### A.    Review of the District Court's Decision

This Court reviews de novo a district court's decision to grant or deny a 28 U.S.C. § 2254 habeas petition. *Ali v. Hickman*, 584 F.3d 1174, 1181 (9th Cir. 2009). Where, as here, the district court does not make factual findings independent of those made by the state court, this Court "simply reviews the state court's findings under section § 2254(d)(2)" (discussed below). *Id.*

### B.    Review of the State Court's Substantive Decision

Under AEDPA, 28 U.S.C. § 2254(d), an application for a writ of habeas corpus on behalf of a state court detainee should be granted if a state court's substantive adjudication of the detainee's claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* In conducting its inquiry under the statute, a federal court looks to the decision of the highest state

22

court to address the merits of a petitioner's claim in a reasoned decision.  *Bartlett v. Alameida*, 366 F.3d 1020, 1023 (9th Cir. 2004).

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

While § 2254 enacts a rule of deference with respect to state court interpretations and application of federal constitutional law, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Consistent with this approach,

> AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

*Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)(citations and quotation marks

23

omitted; emphasis added). *See also Musladin v. Lamarque*, 555 F.3d 830, 839 (9th Cir. 2009) (citing *Williams* and *Panetti* and observing that "AEDPA's 'clearly established Federal law' requirement does not demand more than a 'principle' or 'general standard' in the Supreme Court's caselaw before habeas relief can be granted").

As to 28 U.S.C. § 2254(d)(2), there are a number of bases on which a federal court may determine that a disputed state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and grant habeas relief accordingly. As the Ninth Circuit has explained, a state court factual determination is unreasonable where any appellate court would so characterize it on the grounds that, *inter alia:* the finding is unsupported by sufficient evidence; the state court plainly misapprehends or misstates the record in making a finding on a material factual issue central to the petitioner's claim; and/or the state court has before it, yet apparently ignores, evidence that supports the petitioner's claim. *See Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004).

Finally, it is well-settled that structural errors in the trial mechanism, as opposed to trial errors occurring in the presentation of the case to the jury, are not subject to harmless error review. *See, e.g. Brecht*, *supra*, 507 U.S. at 629; *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). "The existence of such defects ... requires automatic reversal of the conviction because they infect the entire trial process." *Brecht,* 507 U.S. at 629-30. Alternatively, where a federal

24

constitutional error is not deemed structural, the error mandates reversal where it satisfies the standard for trial error prejudice set forth elsewhere in *Brecht*, 507 U.S. at 637, i.e., where the error has exerted "a substantial or injurious effect on the verdict."

## ARGUMENT

I. **THE STATE APPELLATE COURT UNREASONABLY REJECTED PETITIONER'S CLAIM THAT THE TRIAL COURT'S ABSOLUTE PROHIBITION OF ANY DEFENSE INTERRUPTION, INCLUDING OBJECTIONS, DURING THE PROSECUTION'S REBUTTAL ARGUMENT CONSTITUTED STRUCTURAL ERROR**

   A. **Statement of Facts**

      1. **The Trial Court's Gag Orders and Expulsion Threats to Defense Counsel During Closing Argument**

During the prosecutor's initial closing argument at petitioner's state trial, neither counsel for petitioner nor counsel for her co-defendant, Robert Noel, made any objections. (ER 317-367) During defense counsel Ruiz's closing for Ms. Knoller, however, prosecutor Hammer interrupted Ruiz's discussion of the testimony of prosecution witness Esther Birkmaier—specifically, Birkmaier's testimony concerning the events immediately preceding Ms. Whipple's death—with the following comment:

> MR. HAMMER: Your Honor, I'm going to interrupt. I think what I see at the top is you limiting that not for the truth of the matter and Ms. Ruiz is arguing for the truth of the matter. It's pretty obvious from the top of that.

(ER 424)

25

The following exchange then occurred between the trial judge and parties:

THE COURT:     It appears to be so.

MR. HAMMER:    So this is inappropriate argument.  I ask the jury to be admonished.

MS. RUIZ:      Well, Your Honor, this is the testimony that Esther Birkmaier recalls.

MR. HAMMER:    The Court ordered the jury –

THE COURT:     I'm trying to read it.  Just a moment.  Ladies and gentlemen, there was an order by the Court that stands.  Ms. Birkmaier was allowed to tell you what words were used for the purpose of hearing the words, but not for the truth of the matter asserted.  She can testify in court as to what she saw, but this is a conversation that happened outside of court.  And, as I told you at the time it was admitted, you may not consider that conversation for the truth of the matter asserted, rather for the fact that certain words were spoken which may have an independent significance, but not for the truth of the matter asserted, and that will remain the case.  Counsel's instructed to argue in accordance with the Court's ruling.

(ER 424-25)

Thus, the trial court did not find that Mr. Hammer's interruption—essentially a rambling objection that Ms. Ruiz had misstated the evidence—was improper.  To the contrary, the court sustained it and instructed the jury to consider evidence that was the subject of Ms. Ruiz's argument for a limited purpose only.

During his rebuttal argument, Mr. Hammer asserted that one female prosecution witness had, during cross-examination by Ms. Ruiz, testified that she

26

had not complained to Noel about his dogs because "he's got 240 pounds of dog on him" and Noel couldn't control them. (ER 444) Knoller's defense counsel then objected: "Misstates the evidence, Your Honor." (*Ibid.*)

This objection was entirely proper: as the state trial record demonstrates, no witness had testified under cross-examination by Ruiz in the manner that Mr. Hammer alleged. Nonetheless, the court responded: "Counsel, this is closing argument. *There will be no further interruptions or you will be out of the courtroom.*" (ER 444 [emphasis added])

Minutes later, Mr. Hammer made reference to the incident involving prosecution witness Kathy Brooks in Alta Plaza Park. (RT 3395) Brooks testified that Noel had told her that Bane was not friendly, and that she asked him why, if the dog was aggressive, he had not muzzled it. (RT 3396) In his rebuttal, Mr. Hammer made reference to Noel's supposed response: "[I]n Mr. Noel's words I can do whatever I goddamn please, I can go to any park I want with the dog off-leash." (ER 460) Ms. Ruiz raised an objection *for only the second time* during the prosecutor's initial argument and his rebuttal: "Objection, Your Honor. The dog was on leash at all times." *Id*.

The objection, and Ms. Ruiz's recollection of the evidence, was precisely right: Brooks had indeed testified that Bane was on leash during the Alta Park incident. (RT 3396) Nonetheless, the trial court responded in the following manner:

> Counsel, there will be no further objections. The jury will recall the evidence. Ladies and gentlemen, it is

27

improper and counsel's conduct is improper by standing up in closing argument and objecting to her recollection of what the evidence was. The jury will recall what the evidence is. Arguments of counsel are not evidence and it is improper. *And, Ms. Ruiz, please take your seat now and not get up again or the next objection will be made from the holding cell behind you.* Ladies and gentlemen, counsel are entitled to argue what they believe the evidence is. If they are wrong, the jury will recall that. What counsel say the evidence is is not the evidence. And it is not a proper objection to stand up in the middle of closing argument and insert your own interpretation of what the evidence is. Mr. Hammer, continue.

(ER 460-61 [emphasis added])

After the court had forbidden defense counsel from making any further objection whatsoever during closing argument, the prosecutor climaxed his rebuttal argument with a heartfelt appeal to the jury to place themselves in the position of Diane Whipple at the moment of her death. In recreating that scene, Mr. Hammer relied heavily on Exhibit 107, a letter written by Noel to inmates Paul Schneider and Dale Bretches:

Last thing I want you to think about, please, because this is a murder case and you try to recreate Diane Whipple's time in that hallway, what is it she saw before that first bite? . . . Mr. Noel writes "before I could get my body in the doorway to block them, they pushed forward into the hall and took off side by side down the hall toward the elevator in a celebratory stampede." Think of Diane. "240 pounds of Presa wall-to-wall bouncing off and heading for the wall at the end of the hall." Exactly where Diane was standing before she was bitten by these dogs.

Think about the ten minutes that she was ripped to death and her clothes ripped off her and then think about this because this is how she died because of their recklessness. Every time she tried to breathe, think of a

28

> breath in. Every time she tried to breathe, her throat
> closed in on itself, every time. And she crawled, this
> young woman despite her to try to get home and she tried
> to breathe again and her throat closed in again. She tried
> to breathe again and she was alone, she was alone unable
> to even talk. And the dog was still running loose with
> her and she tried to breathe again, and her voice closing
> down with two holes in her larynx and she crawled and
> she tried to push herself up and she crawled some more
> to try to get home and no one was there, no one.
>
> That's what these people's recklessness did, caused that
> kind of death.

(ER 465-66)

## 2. The Trial Court's Post-Hoc Explanation

Defendant subsequently moved for a new trial as to all of her convictions. As noted, the court granted her motion for a new trial as to the murder conviction based on its view of the evidence, but denied the motion as to her convictions for manslaughter and for owning a mischievous dog that kills. (CT 5103-04) The trial court rejected petitioner's challenge to all three convictions insofar as it complained of the court's own orders to defense counsel during the prosecutor's rebuttal argument. Recalling the event, the court first stated that prior to the first defense objection, it had heard "substantial noise" and seen a "very animated discussion" between counsel and petitioner, a "waving of arms," with petitioner urging counsel to "get up." (ER 312) The court thereafter stated that it viewed counsel's first objection to the prosecutor's argument as "improper" *not* because it *was* a prohibited speaking objection, but because "for perhaps the second time in the trial [defense counsel] did *not* make speaking objection" so that "the evidence

29

[defense counsel] was talking about was virtually impossible to identify . . ." (*Id.*)
(Emphasis added)

The trial court then explained that it viewed the second objection as
improper because it

> appeared to the court more to be – more designed to
> interrupt the flow of the prosecution's rebuttal argument
> than anything else. And the Court was quite stern with
> Ms. Ruiz. *The Court indicated that there would be no
> further objections. I wish I had stated the word
> "improper" in there, I didn't*, but my description to the
> jury *afterwards* of why it is not proper for counsel to
> stand up in the middle of an argument and dispute a
> rather small technical point of evidence, *I certainly
> suggested that Ms. Ruiz remain in court and was free
> anytime under the obligation to insert whatever
> objections she deemed appropriate on behalf of her
> client.* She was never removed ...

(ER 313; emphasis added)

### 3.    The First Decision on Appeal

In her initial appeal from her manslaughter and mischievous dog
convictions,[6] petitioner argued, among other things, that under the principle
articulated in *United States v. Cronic*, 466 U.S. 648 (1984) and related precedent,
the trial court's gag orders and expulsion threats violated petitioner's right to
counsel and that it constituted a structural error that was reversible *per se*. *See*
petitioner's initial opening brief on appeal, filed July 28, 2003, at 76-91. In its

---

[6] Petitioner did not and could not complain of the Sixth Amendment violation
during closing argument in connection with the murder conviction because that
conviction had been vacated by the trial court in its order for a new trial, which
order was the subject of the prosecution's appeal.

30

initial (May 5, 2005) decision on appeal, a majority of the State Court of Appeal's three-judge panel rejected this argument. (ER 250-63)

As a factual matter, the appellate court majority opined that the trial court's statements to defense counsel that he would jail her if she objected again had been "ambiguous," and that *counsel* rather than the court had been at fault when she failed to clarify them. (ER 253-54 n.26) According to those two judges, when the trial judge commanded there "would be no further objections" and threatened to jail counsel if she stood up again, "reasonable counsel" would have realized that the judge could not possibly have meant what he so plainly said. According to the appellate majority, Ms. Knoller's trial counsel therefore should have continued to make "proper" objections; alternatively, counsel had a duty to challenge the judge's order by "seek[ing] clarification," an action that would have required her rising again and therefore would have landed her in the holding cell during the remainder of the trial. Thus, the state appellate majority effectively ruled that when judges say "up," they may mean "down," and that the lawyers have a duty to sort out this judicial dyslexia. As it did with its newly coined definition of murder, the appellate court majority relied on an unprecedented legal doctrine, a sort of "Nuremberg" rule of professional conduct, in which lawyers are not only entitled but obligated to defy judicial orders that they believe to be illegal.

This aside, the majority ruled that, for various reasons, the "per se reversible" standard set forth in *Cronic* was inapplicable to the trial court's challenged conduct. On this point, the Court dismissed as insignificant the United

31

States Supreme Court's observation in *Cronic* that "[t]he Court has uniformly found constitutional error without any showing of prejudice [i.e., structural error] when counsel was either totally absent, or *prevented from assisting the accused during a critical stage of the proceeding*," (ER 256) (quoting *Cronic*, 466 U.S. at 659 n.25, emphasis added)—an event that, in petitioner's view, the record clearly disclosed. To the contrary—after entirely ignoring petitioner's argument that counsel's objections had been both well-founded and required for purposes of preserving them on appeal—the appellate court suggested that the trial court's orders and threats constituted a proper exercise of the court's authority to control the courtroom. (ER 258-59)

Finally, the Court of Appeal concluded that petitioner's deprivation of counsel claim could at best be deemed a mere allegation of prosecutorial misconduct or, alternatively, judicial misconduct. (ER 262-68). Declining again to find any abuse of judicial power, the court found only a mild transgression by the prosecutor in unduly appealing to juror emotion by urging them to imagine the fatal dog attack through the eyes of the victim. (ER 265) Applying to this error a standard of prejudice appropriate to simple violations of state law—i.e., a more forgiving standard than the one applying to federal constitutional errors under *Chapman v. California*, 386 U.S. 18 (1967)—the appellate court found the prosecutorial error harmless in light of the purportedly "overwhelming" evidence of petitioner's guilt. (ER 266)

Court of Appeal Justice Haerle authored a stinging dissent from the majority

32

opinion. He attacked as facially unreasonable the majority's conclusion concerning the meaning and effect of the trial court's gag orders and expulsion threats. Specifically, he concluded that the orders and threats were unambiguous and had indeed "prevented" defense counsel from objecting and thereby "assisting" petitioner "during a critical phase of the proceeding [i.e., closing argument]," thereby triggering the rule of *per se* reversal as expressly stated by the Supreme Court in *Cronic.* (ER 280-88) Justice Haerle further concluded that the gag order and threats to counsel were in no way a proper exercise of the court's authority over the courtroom and that the majority had misconstrued relevant facts in this regard. (ER 288-89 n.11) Finally, he harshly criticized the majority not only for minimizing the inflammatory nature of the prosecutor's argument after defense counsel had been silenced, but also for engaging in a "harmless error" analysis in the first instance. (ER 289-91) Accordingly, Justice Haerle would not only have sustained the trial court's order vacating petitioner's murder conviction, but would have reversed her involuntary manslaughter and mischievous dog convictions as well. (ER 291-92)

### 4. The Second Decision Appeal

As noted in the Statement of Case, after the Supreme Court issued its opinion in *People v. Knoller,* 41 Cal.4th 139, 159 (2007), the matter was remanded to the San Francisco trial court, which, refusing to appoint Judge Warren, instead appointed Judge Woolard, who had not presided at trial and thus had not seen and heard the testimony and other evidence, for purposes of reconsidering petitioner's

33

motion for a new trial as to her murder conviction.

After Judge Woolard reinstated that conviction and immediately remanded petitioner back into custody, petitioner pursued an appeal that, for the first time, challenged a judgment of conviction as to murder rather than for the lesser offenses of involuntary manslaughter and owning a mischievous dog that kills— lesser convictions that Knoller had unsuccessfully challenged on her initial appeal and for which she had already served her time in state prison. Invoking again the constitutional principles set forth in *Cronic*, Knoller's second appeal again complained of the gag orders and expulsion threats issued by the trial court to defense counsel during closing argument.

Notwithstanding the fact that the second appeal placed in issue challenged a different and far more serious conviction than did the first, the state urged the Court of Appeal to adhere to its previous disposition of petitioner's closing argument claim on the grounds that such disposition constituted the "law of the case." See Respondent's Brief, filed October 23, 2009, at 9-11. While the Court of Appeal's second opinion did not expressly rely on the law of the case in addressing the closing argument claim, the opinion acknowledged the state's reliance on the doctrine. (ER 122-24, 130) Tellingly, with few exceptions, the text of the Court's second opinion on the closing argument claim is a verbatim restatement of the first. Although Justice Haerle was again a member of the three-judge panel that decided petitioner's second appeal, he indicated at the second oral argument that he was bound by the majority's first opinion, and thus he joined in

34

the Court's 2010 opinion rather than reissuing his earlier dissent. Accordingly, the Court of Appeal's second, 2010 opinion rejected petitioner's closing argument claim on the identical substantive grounds as were stated in the Court's 2005 opinion.

### B. The Trial Court Violated Petitioner's Federal Constitutional Right to Counsel During Closing Argument, a Structural Error that is Reversible *Per Se*

#### 1. Governing Principles

The foregoing developments during the closing argument at Ms. Knoller's trial implicate several elementary federal constitutional principles. Briefly stated, they are as follows:

*First*, a criminal defendant is entitled, under the state and federal constitutions, to representation by counsel at all critical stages of the proceedings against her. See U.S. Const., 6th Amend.; *Powell v. Alabama* 287 U.S. 45, 68-69 (1932). In *United States v. Cronic*, 466 U.S. 648, *supra*, the Supreme Court held that courts are "require[d] . . . to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Id.* at p. 659.

*Second*, a "critical stage" is "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused." *Bell v. Cone* 535 U.S. 685, 695-696 (2002). Closing arguments for the parties are perhaps the most critical stage of any criminal trial. Thus, in *Herring v. New York* 422 U.S. 853, 858 (1975), the Supreme Court held that a deprivation of the right to counsel during the defendant's closing argument requires reversal *per se. Ibid. See also*

35

*People v. Wade* 43 Cal.3d 366, 390 (1987), vacated on other grounds, *People v. Wade* 44 Cal.3d 975 (1988) ("The need for a zealous advocate is particularly important during closing argument.")

*Third*, under governing California law, defense counsel must object to any improper statements during a prosecutor's closing argument in order to preserve that claim for appellate review. *People v. Visciotti* 2 Cal.4th 1, 79 (1992) *See also People v. Bloom* 48 Cal.3d 1194, 1213 (1989). The right and duty to object, moreover, specifically extends to claims that the prosecutor has misstated the evidence during closing. *Visciotti*, 2 Cal.4th at p. 79, citing *People v. Green* 27 Cal.3d 1, 28 (1980); *see also People v. Carrera* 49 Cal.3d 291, 319-320 (1989) (suggesting that defense counsel's failure to object to a prosecutor's misstatements during closing could form the basis for a claim of ineffective assistance of counsel).

*Finally*, the court may not interfere with the constitutional right of a criminal defendant to make good-faith objections. "[I]t is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts." *Sacher v. United States* 343 U.S. 1, 9 (1952). *See also Cooper v. Superior Court* 55 Cal.2d 291, 298 (1961) ("The power to silence an attorney does not begin until reasonable opportunity for appropriate objection or other indicated advocacy has been afforded."); *id*., 300 ["Even if a legal

36

proposition is untenable, counsel may properly urge it in good faith."] (citation omitted).)  Consistent with *Sacher*, the Supreme Court has held that the rights to be heard and to present a defense shield an attorney from a finding of contempt made in response to the attorney's motions for change of venue and disqualification of a judge, where the words in the motions were in plain English, were in no way offensive in themselves, and were appropriate to the bias allegations.  *Holt v. Virginia*, 381 U.S. 131, 137 (1965).

### 2.    The Trial Court's Threats and Orders to Petitioner's Counsel Were Unwarranted

As noted, the first objection during closing argument came from the prosecutor, who, in a lengthy speaking objection, essentially claimed that defense counsel had misstated the evidence.  Irrespective of whether the objection was correct, it is clear the prosecutor had the right to make it, and he was, in fact, permitted to do so.

When Ms. Ruiz succinctly and correctly interposed her first "misstates the evidence" objection during the prosecutor's rebuttal, the court responded, "Counsel, this is closing argument.  There will be no further interruptions or you will be out of the courtroom."  (ER 444)  Thus, the court did not rule on the objection, but, rather, ruled that all objections from defense counsel were categorically improper.  That ruling was absolutely wrong, indeed outrageous.  Such objections are not only permissible, but under controlling state precedent, defense counsel was ethically and constitutionally obliged to make them.  See, e.g.*, Carrera*, *supra,* 49 Cal.3d at pp. 319-320.  Furthermore, Ms. Ruiz had made

37

the same objection—misstates the evidence—that the trial court had sustained when made by the prosecutor in a far less proper form.

The trial court threatened defense counsel that she would be sent to the hallway if she made another objection of *any kind*. The court in no way limited its ban to frivolous objections made in bad faith. The court thus threatened Ms. Ruiz with expulsion from the courtroom if she performed a function that the law *required* of her—"to seek an admonition if [counsel] believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry." *Visciotti, supra*, 2 Cal.4th at 79.

Under *Visciotti* and *Cooper*, Ms. Ruiz likewise had the right and duty to raise her second objection that Mr. Hammer had misstated the evidence which, as noted, he had done. The trial court, of course, had the right to overrule this objection if it lacked merit, but it could not criticize counsel for making it. The court, however, did just that, labeling counsel's conduct in "standing up in closing argument and objecting" as improper, despite the fact that the defense objection mirrored, in a more restrained form, the conduct of Mr. Hammer minutes earlier. The trial court then threatened Ms. Ruiz with jail if she rose again during Mr. Hammer's argument. (ER 461) By forbidding Ms. Ruiz from making any objection of any kind from that point on, Ms. Ruiz was rendered incapable of performing her duty, or exercising her client's constitutional right, to make objections during the prosecutor's closing argument, a critical stage of the trial. The threat of incarceration constituted a court-imposed deprivation of counsel.

### 3. The Sixth Amendment Violation Was Structural Error That Was Prejudicial Per Se

As previously noted, the Supreme Court explained in *Cronic* that "[t]he Court has uniformly found constitutional error *without any showing of prejudice* [i.e., structural error] when counsel was either totally absent, or *prevented from assisting the accused during a critical stage of the proceeding*." *Id.*, 466 U.S. at 659 n.25 (emphasis added). The Court, moreover, founded this express statement of the rule on no less than seven of its own prior decisions. See *id.*, and citations therein. *See also Gideon v. Wainwright,* 372 U.S. 335 (1963) (holding court-ordered deprivation of right to counsel amounts to structural error not subject to harmlessness analysis); *Geders v. United States,* 425 U.S. 80 (1976) (cited with approval in *Cronic*, and holding bar on consultation between attorney and client during overnight recess requires automatic reversal); *Bell v. Cone, supra*, 535 U.S. at 695-96; *Curtis v. Duval* 124 F.3d 1, 5 (1st Cir. 1997)(observing, as to defense counsel's absence when trial court, during jury deliberations, gave sua sponte supplementary instruction, that for purposes of *Cronic* rule, "although this deprivation was short-lived, it occurred during a vital point in the trial and was, within its terms, total.").

Under clearly established Supreme Court precedent: (1) closing argument at petitioner's trial was a "critical stage of the proceedings"; (2) the trial court's unwarranted gag orders and expulsion threats prevented petitioner's counsel from assisting petitioner during that critical stage; and (3) the violation was a structural

39

error that mandated reversal of petitioner's murder conviction without any further showing of prejudice. *Cronic*, 466 U.S. at 659 and n.25.

### C. The State Court of Appeal's Decision Contravened and/or Unreasonably Applied Established Supreme Court Precedent and Was Based on an Unreasonable Determination of the Facts

#### 1. The State Appellate Court Unreasonably Found the Trial Court's Orders and Expulsion Threats "Ambiguous"

Again, the state appellate court based its decision in part on a perception that the trial judge's statements to defense counsel had been "ambiguous," thereby imposing on *counsel* the duty to clarify them:

> Although defendant maintains that the court's order unambiguously silenced her, the record establishes that immediately after it told Ruiz not to object any further or she would be placed in the holding cell, it explained to the jury that Ruiz's conduct was "improper." It then explained to the jury the reasons it perceived her conduct as being improper. Thus, a reasonable attorney would have interpreted the court's order as indicating that Ruiz was not to make any further "improper" objections. To the extent the court's ruling was ambiguous, Ruiz had a duty to seek clarification. (See *Gallagher v. Municipal Court* (1948) 31 Cal.2d 784, 796 ["An attorney has the duty to protect the interests of his client. He has a right to press legitimate argument and to protest an erroneous ruling"].)

(ER 133 n.25)

The notion that the trial judge's statements were in any respect unclear and that counsel, rather than the trial court, was to be faulted for failing to clarify them is as unreasonable a construction of the state court record as can be imagined. As Judge Haerle urged in his dissent from the appellate court's initial (2005) decision:

40

> The court's gag orders and expulsion threats were not in the slightest bit "ambiguous." (p. 444-45, fn. 26 ante.) The key sentence in one of them was, again: "And, Ms. Ruiz, please take your seat now and not get up again or the next objection will be made from the holding cell behind you." After that, the reporter's transcript shows a paragraph break and, from that point of time on, Judge Warren was clearly addressing only the jury. But in both the sentence just quoted and the earlier portion of his orders, he had made it abundantly clear to Ruiz that she was to be expelled from the courtroom and placed in a Los Angeles County jail cell as and when she made any further objection to the prosecutor's closing statement.

(ER 283-84)

As Justice Haerle further observed, "[t]he second order of Judge Warren, the one that contained the mention of Ruiz's possible confinement in a 'holding cell,' still amounted to a threat of expulsion from the courtroom; I am not aware that Los Angeles County has started to emulate Russia and place holding cells inside its courtrooms." (ER 284 n.6) And Judge Warren himself implicitly conceded the breadth of his earlier gag orders and expulsion threats when, at the new trial hearing, he insisted that they applied only to "improper" objections. As Justice Haerle correctly noted, "[t]his belated attempted modification of the admonition was not at all what Judge Warren had told Ruiz three months earlier." *Id*.

Significantly, the district court likewise rejected the state appellate court's untenable effort to cast the trial court's statements as unclear, observing:

> The Court of Appeal's conclusion that Judge Warren's order did not have the actual effect of silencing Petitioner's counsel was unreasonable, because there was no factual basis for it. Judge Warren's direction to Ruiz was clear: "Ms. Ruiz, please take your seat now and not get up again or the next objection will be made from the

41

> holding cell behind you." Any reasonable lawyer in
> Ruiz's position could only have concluded that to object
> further – whether the objection was "improper" or not –
> was to risk being escorted from the courtroom and into a
> holding cell. The Court of Appeal points to nothing in
> the record showing that Ruiz was prepared to take that
> risk, and it is implausible that any lawyer would have.

(ER 33)

The construction of Judge Warren's order and threats as "ambiguous"

supplied one of the factual bases for the appellate court's conclusion that Judge

Warren had not deprived petitioner of her right to counsel at a critical stage.  Such

a construction was unsupported by insufficient evidence, misstated the record on a

material fact, and ignored significant evidence in petitioner's favor. Accordingly,

the state court's ultimate ruling was "based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. §2254(d)(2); *Taylor v. Maddox*, 366 F.3d at 999-1001.  Indeed, it can only

be explained by the undue sensitivity of the majority to the public hostility that

had driven the trial from San Francisco in the first place.

> **2.    The State Appellate Court Contravened and/or
> Unreasonably Applied Supreme Court
> Precedent in Ruling that the Trial Court's
> Orders and Expulsion Threats Were a Proper
> Exercise of its Authority to Control the
> Courtroom**

Another key component of the state appellate court's rejection of

petitioner's structural error claim consists of its ruling that not only had the trial

court done nothing to truly prevent defense counsel from assisting petitioner

during the prosecution's rebuttal argument, but that such court's orders and threats

42

to counsel had in fact reflected a proper exercise of that court's authority to control the courtroom. See ER 138 (stating that *Herring* "clarified that the judge retains the power to control the courtroom, including limiting or interfering with the attorney's argument," and quoting purportedly supporting excerpts from the case). In this connection, the appellate court took note of defense counsel's purportedly "disruptive" behavior at earlier points in the trial. (ER 138-39 and n.27) And while the court acknowledged *Sacher's* statement that "it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling," it highlighted another portion of *Sacher* in which the Court stated that "if the ruling is adverse, it is not counsel's right to resist it or to insult the judge--his right is only respectfully to preserve his point for appeal." (ER 139-40, citing *Sacher*, 343 U.S. at 9.)

Significantly, the district court also rejected this element of the state court's analysis, stating that its order below "should not be read as an endorsement of any aspect of Judge Warren's order to Ms. Ruiz. The order was erroneous and inappropriate." (ER 34, n.8) On this point, the district court was absolutely correct. *First*, as a factual and preliminary matter, petitioner's briefing in the state appellate court specifically contended that, under *Visciotii* and related precedent, her trial counsel's assertion of objections to the prosecutor's rebuttal arguments were both well taken and *necessary* in order to preserve the claims on appeal. In both of its opinions, however, the Court of Appeal, simply failed to respond to that key claim. *Taylor v. Maddox*, 366 F.3d at 999-1001 (state decision may be

43

rendered factually unreasonable where state court should have made a finding of fact but failed to do so.)

*Second,* with its invocation of *Sacher,* the state appellate court essentially ruled that, having objected and heard the trial court's orders and expulsion threats in response, petitioner's counsel had been obliged to accept the court's "rulings" and sit mute for the remainder of the prosecutor's argument. Yet, as noted, the appellate court elsewhere faulted petitioner's counsel because she had failed to "protect the interests of her client" by seeking a clarification of the trial court's purportedly "ambiguous" remarks—in other words, counsel should have pressed the trial court further to elicit a "clarification" that "proper" objections were, in fact, permissible. (ER 133 n.25 (citing *Gallagher v. Municipal Court,* 31 Cal.2d 784, 796 (1948).) These flatly inconsistent positions likewise expose the irrationality and bias of the analysis of the appellate court majority.

*Third*, and of perhaps greatest importance, the state court record makes it abundantly clear that the objections raised by petitioner's counsel were in plain English, were in no way offensive in themselves, and were an appropriate — indeed, legally required—response to the substance of the prosecutor's argument.[7]

---

[7] The trial court's post-trial reference to the purported "noise" and activity at the defense table prior to the counsel's first objection certainly did not justify the court's orders and expulsions threats. The court's subsequent explanation made it clear it issued those orders and threats because it (incorrectly) deemed the defense objections improper on substantive grounds. (ER 312-13) Tellingly, during the argument itself, the court had made no reference to any "disruptive" conduct by defense counsel *other* than the raising of the objections themselves. And, again, the court related its orders and expulsion threats to any further *objections* by counsel, not to any non-verbal conduct on her part.

44

This being so, the categorical directive that counsel remain seated and silent under threat of expulsion to a holding cell constituted a threat of punishment for legitimate advocacy that egregiously undermined petitioner's rights to be heard, to present a defense, and implicitly, to the assistance of counsel. *Holt v. Virginia*, 381 U.S. at 137.

Viewed in this light, the appellate court's claims concerning counsel's purportedly "disruptive" conduct at other times is simply beside the point. As Justice Haerle's dissent to the initial opinion stated, if in fact counsel had *previously* been disruptive, then the remedy was to control the behavior, if necessary by means of a contempt proceeding, at the time that it occurred. (See ER 288-89 n.11) But a trial court does *not* properly exercise its authority to control the courtroom by issuing threats to counsel for such past acts at a *later* time when counsel later engages in wholly legitimate advocacy. To the contrary, in such an instance, a trial court abuses its authority and undermines the reliability of the entire trial process.

For all these reasons, the appellate court's stated approval of the trial court's conduct vis-a-vis petitioner's counsel was flatly, objectively wrong.

       **3.**     **The State Appellate Court Unreasonably Applied Supreme Court Precedent in Determining that the Trial Court Did Not Deprive Petitioner of Counsel During A Critical Stage**

       **a.**     **The Plain Meaning of *Cronic***

The final element of the state appellate court's analysis consisted of its view

45

that application of the rule of *per se* reversal, as set forth in *Cronic* and the Supreme Court precedent on which it relied, requires a "complete" deprivation of counsel of a sort that purportedly did not occur here. (ER 134-42) For this proposition, the appellate court purported to rely on subsequent Supreme Court precedent, including *Bell v. Cone*, 535 U.S. 685 (2002); *Arizona v. Fulminante*, 499 U.S. 279 (1991) and related cases; and *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). *Id*. To be sure, the appellate court conceded that closing argument is a critical stage of the trial proceedings. (ER 133 (citing *Herring v. New York, supra)*). But the court nevertheless ruled that the orders and expulsion threats merely imposed a "limitation" on counsel that did not improperly interfere with petitioner's right to counsel, much less "completely" deprive her of that right at this critical stage. (ER 137-38, 141)

The state appellate court's reasoning on these points contravenes the Supreme Court's decision in *Cronic* and related precedent. Again, that decision expressly held that the structural error appears where counsel is "prevented from assisting the accused during a critical stage of the proceeding." 466 U.S. at 659 n.15; *see also Bell v. Cone,* 535 U.S. at 695-96 (stating that under *Cronic*, "[a] trial would be presumptively unfair . . . where the accused is denied the presence of counsel at "a critical stage . . ."); *id*., at 696 n.3 (recounting *Cronic*'s observation that Supreme Court has presumed prejudice in cases "involv[ing] criminal defendants who had actually or constructively been denied counsel by government action," and citing cases); *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (observing

46

that structural error may occur whether or not the defendant is completely deprived of counsel: "We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied *entirely or during* a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.") (emphasis added).

The trial court's orders and threats plainly satisfied *Cronic*'s express criteria for identifying a *per se* violation of defendant's right to counsel. The appellate court's conclusion that such criteria did not apply because the trial court's conduct did not more "completely" prevent counsel from assisting petitioner is baseless. If, as it repeatedly suggests (ER 138, 141-42), the appellate court meant that the orders and threats affected only a limited portion of the trial, and that counsel was not prevented from performing her functions at other stages (such as making motions, presenting defense evidence, cross-examining witnesses, etc.), then its reasoning contravenes Supreme Court and related precedent locating structural error in any deprivation of counsel during a "critical phase of the proceedings," no matter how long or short the duration of the deprivation. (See ER 287-88 [Judge Haerle's dissent], and citations therein.)

The state appellate analysis is equally unreasonable to the extent that it means to say that the trial court's conduct did not *substantively* prevent counsel from assisting petitioner during a critical stage. Objecting immediately to the prosecution's argument was the meaningful role petitioner's counsel could, and

47

was legally required to, fulfill during the rebuttal. And as a matter of simple English and common sense, a threat to *both* remove *and* jail petitioner's only trial counsel if she objected again to the prosecutor's erroneous argument—a threat admittedly delivered in a manner "quite stern with Ms. Ruiz"—was no different in effect than would have been the action of actually jailing Ms. Ruiz for the remainder of prosecutor Hammer's argument. Any reasonable court would have to conclude that the jailing of a defendant's attorney during closing argument would meet the *Cronic* standard for structural error. By the same measure, the gagging of Ms. Ruiz constituted a complete denial of counsel and not just, as the majority seems to contend, a mere "limitation" on counsel.

The state appellate court's reasoning and result were contrary to the Supreme Court's decision in *Cronic* within the meaning of §2254(d)(1). *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008). In addition, to the extent the court construes the trial judge's orders and threats to defense counsel are mere "limitations" on her role as defense counsel, the appellate court's analysis was based on unreasonable determination of the facts within the meaning of §2254(d)(2). *Taylor v. Maddox*, 366 F.3d at 999-1001.

### b. Subsequent Supreme Court Precedent

As noted, the state appellate court invoked several post-*Cronic* Supreme Court decisions in its effort to modify—and dilute—the meaning of *Cronic*'s plain language. The state court's analysis of these decisions is gravely flawed.

*First*, the Court of Appeal cites *Bell v. Cone, supra,* to support the notion

48

that, read in conjunction with *Cronic*, *per se* prejudicial Sixth Amendment

violations appear only where a criminal defendant is "completely" denied counsel

in a more egregious manner than appears where counsel is "*prevented from*

*assisting the accused during a critical stage of the proceeding*." (ER 238, 244-45)

But far from altering or limiting *Cronic, Bell* affirms the clearly established rule

on which petitioner has relied. In *Bell*, an 8-1 majority of the Supreme Court

overruled a holding of the Sixth Circuit Court of Appeals which had granted the

petitioner a writ of habeas corpus based on his claim that, at the sentencing

hearing after his Tennessee state court trial, "his counsel rendered ineffective

assistance." *Bell,* 535 U.S. at 695. The Supreme Court ruled that the Sixth Circuit

had erred in applying the *Cronic* standard to an ineffective assistance of counsel

claim, which is properly governed by *Strickland v. Washington,* 466 U.S. 668

(1984), decided on the same day as *Cronic. Bell,* 535 U.S. 695-98.

    *Bell* next recounted that in *Cronic*, the Court had held that "[a] trial would

be presumptively unfair . . . where the accused is denied the presence of counsel at

'a critical stage' [citation], a phrase we used in *Hamilton v. Alabama,* 368 U.S. 52,

54 . . . (1961) and *White v. Maryland,* 373 U.S. 59, 60 . . . (1963) (per curiam), to

denote a step of a criminal proceeding, such as arraignment, that held significant

consequences for the accused." *Bell,* 535 U.S. at 695-96. *Bell* then dropped a

footnote stating that, "in a footnote [*in Cronic*], we also cited other cases besides

*Hamilton v. Alabama* and *White v. Maryland* where we found a Sixth Amendment

error without requiring a showing of prejudice. *Each involved criminal defendants*

49

who had actually or constructively been denied counsel by government action.
See *United States v. Cronic*, 466 U.S. 648, 659, n. 25 . . . (1984)." *Bell*, 535 U.S.
696, n. 3 (emphasis added) Finally, *Bell* cited and summarized the facts of the
other five cases—besides the two it cited in the text— which it had previously
cited in *Cronic*'s footnote 25.

Thus, *Bell* makes it clear that the law as summarized in footnote 25 of
*Cronic* and the text to which it is attached has long been, and continues to be, the
clearly established precedent of the United States Supreme Court.  Indeed, *Bell*
adds that *Cronic* applies where government action "constructively" denies counsel
to a criminal defendant. That is precisely what occurred here: petitioner's counsel
may have been physically present, but the trial court's orders and threats rendered
her "constructively" unavailable for the majority of the prosecutor's rebuttal
argument.  In any event, to construe *Bell* as limiting the reach of the *Cronic* rule is
patently unreasonable.

*Second*, the appellate court concluded that the *Cronic* principle did not
apply to the trial court's conduct because the impact of the error purportedly did
not affect the entire conduct of the trial from "beginning to end" or the
"framework" of the trial, or otherwise "infect the entire  trial process" or render it
"fundamentally unfair."  (See ER 140-41, citing *Arizona v. Fulminante*, 499 U.S.
at 207), and ER 134, citing *Neder v. United States*, 527 U.S. 1, 8 (1999).)  When it
describes these attributes of structural error caused by a deprivation of counsel,
however, the appellate court simply ignores *Cronic's* pronouncement that

50

preventing assistance of counsel during a critical stage, as occurred here, *does* render a trial presumptively unfair. In other words, such conduct by the trial court does affect and infect the entire trial process, rendering it fundamentally unfair, etc., precisely because the Supreme Court has conclusively said that it does. Neither *Cronic* nor any other Supreme Court decision permits a state court to rule a deprivation of counsel non-structural error because it is "harmless"—i.e., not sufficiently pervasive—when the Supreme Court has already made an express determination to the contrary.

Significantly, in *Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009), a habeas petitioner argued that the state courts had unreasonably denied his claim that the trial court had deprived him of his right to counsel at a critical stage within the meaning of *Cronic*. The trial court, in the absence of defense counsel, had made a mid-deliberation communication to the jury referring it back to the original instruction given at the close of the evidence. This Court affirmed the district court's rejection of this claim on the grounds that the state court had not been unreasonable in deciding that the communication to the jury had not occurred at a critical stage (not the issue in the present case). *Id*, at 839-43.

On the other hand, however, *Musladin* flatly rejected the state's initial argument—founded (as here) on *Fulminante* and related precedent—that the Court should depart from *Cronic* in favor of a "new test, focusing on the pervasiveness of the error, [that purportedly has] been substituted for *Cronic's* bright line rule that deprivation of counsel is automatically reversible error." *Id*., at 837 (footnote

51

omitted). As the Ninth Circuit explained,

> ... *Cronic* specifically holds that automatic reversal is required where a defendant is denied counsel at a "critical stage," and we cannot depart from that holding. The state's argument that we need no longer follow *Cronic* because of *Satterwhite* [*v. Texas*, 486 U.S. 249 (1988)] and *Fulminante* is simply wrong. The Supreme Court has made clear that the circuit courts must follow Supreme Court precedent until the Supreme Court itself declares it no longer binding. This is true even if the Court's subsequent decisions cast strong doubt on the continuing strength of the precedent. " 'If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.' " *Agostini v. Felton*, 521 U.S. 203, 237 ... (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 ... (1989)). *Agostini* is applicable here: Because *Cronic* is directly on point, we are required to continue to apply *Cronic's* rule of automatic reversal in cases involving absence of counsel at a critical stage.

*Musladin*, 555 F.3d at 837-38.

The state appellate court's reliance on *Fulminante* and related precedent in support of an implied new test—one that requires a defendant to identify a deprivation that demonstrably affects the conduct of the trial from beginning to end—cannot be squared with *Cronic's* express holding and statement of the governing rule. Such reliance therefore was patently and objectively unreasonable for the reasons expressed by the Supreme Court in *Agostini* and by the Ninth Circuit in *Musladin*.

Additionally, the state appellate court asserts that *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)—a case decided after petitioner's first

52

appeal and cited by petitioner in her second—supports its conclusion that whether or not a deprivation of counsel qualifies as structural error turns on whether it undermines the trial process and demonstrably affects the trial throughout.  (ER 136-37)  In *Gonzalez-Lopez,* however, the Supreme Court held that the trial court's erroneous disqualification of chosen defense counsel was a structural error that was reversible per se and therefore not subject to a showing that actual counsel's performance had been deficient and/or prejudicial under the test set forth in *Strickland v. Washington*, 466 U.S. 668, 691-92 (1984). In so holding, the Supreme Court *rejected* the dissent's insistence that the presence of structural error should turn on a finding of identifiable unfairness and prejudice—an approach like that adopted by the appellate court in the present matter.  As Justice Scalia stated for the majority:

> [A]s we have done in the past, we rest our conclusion of structural error upon the difficulty of assessing the effect of the error.  See *Waller v. Georgia*, 467 U.S. 39, 49, n. 9 . . . (1984) (violation of the public-trial guarantee is not subject to harmlessness review because "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance"); *Vasquez v. Hillery*, 474 U.S. 254, 263 . . . (1986) ("[W]hen a petit jury has been selected upon improper criteria or has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained").  The dissent would use "fundamental unfairness" as the sole criterion of structural error, and cites a case in which that was the determining factor, see *Neder v. United States*, 527 U.S. 1, 9 . . . (1999) (quoted by the dissent, post, at 2569). But this has not been the only criterion we have used.  In addition to the above cases using difficulty of assessment as the test, we have also relied on the irrelevance of harmlessness, see *McKaskle v. Wiggins*, 465 U.S. 168, 177, n. 8 ... (1984)

53

> ("Since the right to self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis").

*Gonzalez-Lopez*, 548 U.S. at 148-49 n.4. (Italics added; parallel citations omitted)

*Gonzalez-Lopez* thus disapproved of the very type of "fundamental unfairness" or "pervasive error" test for structural error that the appellate court applied in refusing application of a reversal *per se* standard of prejudice to the Sixth Amendment violation. Here again, the state appellate court's holding constitutes an unreasonable application of governing Supreme Court precedent under §2254(d)(2).

*Finally*, petitioner recognizes that in *Glebe v. Frost*, 135 S.Ct. 429 (November 17, 2014) (per curiam), the Supreme Court vacated the Ninth Circuit's opinion in *Frost v. Van Boening*, 757 F.3d 910 (9th Cir. 2013), a case on which petitioner had relied in a notice of supplemental authorities submitted to the district court. The Supreme Court in *Glebe* rejected the Court of Appeal's conclusion that the state courts had unreasonably declined to find structural error where a trial court order permitted defense counsel to present one theory of the defense but precluded argument on another. Nevertheless, any error in an order that permits counsel to affirmatively present oral argument with a single limitation on substance is a form of error that permits review under *Brecht*. The same cannot be said of a judge's absolutely silencing defense counsel, and thus effectively removing her from the courtroom, as occurred in the present case. *Glebe* does not alter the analysis that should control here.

54

### 4. The District Court's Order

As noted, the district court rejected key elements of the state's court's analysis and correctly ruled that (1) Judge Warren's orders to Ms. Ruiz during the prosecution's rebuttal argument unambiguously directed her to refrain from making any interruptions of any kind, including objections, lest she be expelled from the courtroom and jailed; and (2) the orders were unjustified and therefore could not be approved as a proper exercise of the court's authority to control the proceedings. But the district court nevertheless ruled that the state court was not unreasonable in refusing to find structural error because *Cronic's* statement that such error occurs where a defendant is denied counsel during a critical phase constituted mere "dictum" rather than a clearly established Supreme Court holding. (ER 24)

The district court's analysis is not persuasive. *Cronic's* statement of the law, including its footnote 25, is a clear statement of the governing legal principle that the state court was bound to follow. That much is made clear by the fact that the Supreme Court later invoked the *Cronic* rule in *Mickens v. Taylor*, 535 U.S. at 166[8] and applied it in determining that a defendant must establish the presence of an *actual* conflict of interest before a deprivation of counsel triggering a

---

[8] "We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, *where assistance of counsel has been denied entirely or during a critical stage of the proceeding.* When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens*, 535 U.S. at 166 (emphasis added) (citing, inter alia, *Cronic*, 466 U.S. at 658–659).

presumption of prejudice under the *Cronic* rule can be established. The *Cronic* principle thus constitutes an express legal rule that the Court itself has recognized and incorporated into its holdings and cannot be dismissed as the sort of gratuitous, ill-defined abstraction that the district court perceived. *See also Musladin v. Lamarque,* 555 F.3d at 837 (recognizing as a *holding Cronic's* rule that automatic reversal is required where a defendant is denied counsel at a critical stage).

## II. THE TRIAL COURT'S CONSTITUTIONAL ERROR IN PROHIBITING ANY DEFENSE INTERRUPTION, INCLUDING OBJECTIONS, DURING THE PROSECUTION'S REBUTTAL ARGUMENT HAD A SUBSTANTIAL AND INJURIOUS EFFECT UPON THE JURY'S VERDICT

### A. This Court Independently Assesses the Prejudicial Effect of Federal Constitutional Error Under *Brecht*

Petitioner has plainly established an extraordinary violation of her Sixth Amendment rights. Accordingly, in the event that this Court rejects petitioner's structural error argument and concludes that the petitioner's right to counsel claim is subject to harmless error analysis, petitioner is entitled to relief if the error exerted a substantial and injurious effect on the jury's verdict, and therefore met the standard set forth in *Brecht, supra.* See *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007). The federal courts conduct this inquiry without regard to the state court's harmless determination. *Id*; see also *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir.2011).

Furthermore, in applying *Brecht,*

> [I]f one cannot say, with fair assurance, after pondering

56

> all that happened without stripping the erroneous action
> from the whole, that the judgment was not substantially
> swayed by the error, it is impossible to conclude that
> substantial rights were not affected. The inquiry cannot
> be merely whether there was enough to support the
> result, apart from the phase affected by the error. It is
> rather, even so, whether the error itself had substantial
> influence.

*Merolillo,* 663 F.3d at 454 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765,

(1946)) (alteration in original). "Where the record is so evenly balanced that a

judge 'feels himself in virtual equipoise as to the harmlessness of the error' and

has 'grave doubt' about whether an error affected a jury [substantially and

injuriously], the judge must treat the error as if it did so." *Id.* (quoting *O'Neal v.*

*McAninch,* 513 U.S. 432, 435–38 (1995))

The district court purported to apply *Brecht* in assessing the impact of the

Sixth Amendment violation and declined to find it prejudicial. (ER 27-34)

However, that ruling—which this Court reviews de novo—is wholly unpersuasive.

It largely duplicates a faulty state court discussion of harmlessness that considers

the prejudice arising from the trial court's disparaging remarks in isolation from

the prejudice arising from the prosecution's highly inflammatory argument.

Perhaps even more egregiously, the lower court's ruling ignores the fundamental

weakness, indeed, the absence, of any persuasive evidence that Ms. Knoller

harbored implied malice at the time of her relevant act.

**B.    The Trial Court's Orders and Expulsion Threats Were**
**Prejudicial**

Given the nature of the trial court's orders and the context in which they

57

occurred, it cannot be said with fair assurance that the judgment was not swayed by the Sixth Amendment violation in this matter.

*First*, in the presence of the jury, the court declared Ms. Knoller's counsel both guilty of misconduct and deserving of expulsion from the courtroom. That declaration was utterly unwarranted and unfair. It conveyed to the jury that the court held the opinion that Ms. Ruiz was not to be trusted in her own summation of the evidence. The prosecutor, on the other hand, received no rebuke from the court for his objection, strongly suggesting a view by the court that the prosecutor, unlike Ruiz, was a trustworthy advocate.

*Second*, by silencing defense counsel, the trial court made it impossible for Ms. Ruiz to object to the blatantly improper but emotionally powerful climax of the prosecutor's rebuttal argument: his appeal to the jurors that they "consider the suffering of the victim." *People v. Stansbury* 4 Cal.4th 1017, 1057 (1993). The prosecutor asked the jurors to vicariously share Ms. Whipple's dying breath in extraordinarily graphic terms. As the California Supreme Court held in *Stansbury*: "We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt." *Ibid*.; accord, *People v. Fields* 35 Cal.3d 329, 362 (1983). It is difficult to imagine an improper emotional appeal more likely to cause a jury to depart from their duty to view the evidence objectively than was made by the prosecutor at petitioner's trial.

/ /

58

Indeed, the same Court of Appeal that decided petitioner's appeal later subsequently confronted the issue of the prejudice caused by a similar act of prosecutorial misconduct in closing argument. *People v. Vance,* 188 Cal.App.4th 1182 (2010) In that case, however, Justices Lambden and Ruvolo, the *Knoller* majority, were replaced by Justices Kline and Richman, who joined Justice Haerle, the *Knoller* dissenter. The *Vance* court began by noting that:

> There is a tactic of advocacy, universally condemned across the nation, commonly known as "The Golden Rule" argument. In its criminal variation, a prosecutor invites the jury to put itself in the victim's position and imagine what the victim experienced. This is misconduct, because it is a blatant appeal to the jury's natural sympathy for the victim. (See *People v. Lopez* (2008) 42 Cal.4th 960, 969-970 [71 Cal.Rptr.3d 253, 175 P.3d 4], and decisions cited.)

*Id*., at 1187.

In unanimously reversing due to the prosecutor's clear violation of the rule, the *Vance* court further stated: "California joins with the nation in generally prohibiting Golden Rule arguments by counsel in criminal trials, *a near-categorical prohibition attributable to the unusually potent prejudicial impact of a Golden Rule argument in determining guilt*." *Id*., at 1198-99 (emphasis added). The refusal of the *Knoller* majority in 2005 to apply California's "Golden Rule," the same majority that mangled the law of implied malice, only to be unanimously reversed by the California Supreme Court, illustrates clearly the result orientation and "extreme malfunction' of the state criminal justice system in this highly politicized case.

59

*Third*, as this Court has recognized, "[i]n the adversarial process, the prosecutor, more than neutral jurists, can better perceive the weakness of the state's case." *Singh v. Prunty* 142 F.3d 1157, 1163 (9th Cir. 1998)  Given that Mr. Hammer felt the need to inflame the jury with his improper appeal to juror passion at the very conclusion of his argument, well knowing that defense counsel had been rendered powerless to act, the state appellate court erred in concluding that no juror was moved by his appeal to elevate petitioner's offense from what it was to what it was not.

*Fourth*—and of great importance—for all of the developments and incidents described by prosecution witnesses that occurred before the fatal incident, the prosecution had an extraordinary challenge in proving petitioner guilty of second degree murder, as opposed to the kind of gross criminal negligence that would support the manslaughter offense for which petitioner was also convicted.  Under *People v. Knoller*, 41 Cal.4th at 156, the prosecution was required to prove that at the time of her purportedly criminal act—identified by the prosecutor as the moment petitioner opened her apartment door prior to the dogs' escape, see, e.g., RT 5256-62—Ms. Knoller knew such act posed a danger of another's death *and* that she acted in conscious disregard of that risk.

But, again, during the evidentiary phase of trial, (1) the prosecution introduced no evidence that prior to January 26th, Bane or Hera had ever caused the death of a human on a dog walk or in any other circumstance; (2) the prosecution introduced no evidence that any member of the Presa Canario breed

60

had ever caused the death of a human being under any circumstance; and (3) the prosecution introduced no evidence that a dog of any breed had ever caused the death of a human while being walked by, or in the presence of, its owner.[9] To the contrary, the only evidence bearing on the issue of fatalities occurring during dog walks by owners came from Doctor Lockwood, the prosecution's expert, one of the country's leading authorities on the epidemiology of fatal dog bites. (RT 5152) Lockwood testified that in the more than 300 dog-caused fatalities that he had studied over that period, there never had been a case, as here, "of a healthy adult young woman who has been killed by a dog when the owner is present. Usually the presence of the owner has been sufficient to prevent the attack." (RT 5191)

Given the above, proving that Ms. Knoller actually and consciously considered the danger of another's death when she opened her apartment door and that she consciously disregarded the risk of death at that time was virtually impossible. Beseeching jurors to imagine the horror and pain of Ms. Whipple's death was a highly effective means of overcoming the difficulties entailed by an objective and dispassionate consideration of the evidence vis-a-vis the demanding legal standard defining an implied malice murder.

*Finally*, the state court's notion that the record evinced "strong" evidence of guilt, uncritically accepted by the district court (ER 29), is utterly irreconcilable with the view expressed by Judge Warren, the only judge involved in this case

---

[9] See also RT [II] 93 (reporting prosecutor's statement at 2008 sentencing that, "this is the first murder conviction in California based on a dog mauling.")

who actually had the opportunity to view the witnesses and who found the evidence insufficiently weighty to justify a murder as opposed to manslaughter conviction. He did so based on a specific finding of fact that Ms. Knoller did not know or consider that her walking of a dog or dogs on the day of the charged murder could result in death.  See *Knoller,* 41 Cal.4th 149-151.

For all of these reasons, the Sixth Amendment violation that occurred at petitioner's trial was prejudicial under *Brecht.*  Habeas relief is in order.

## CONCLUSION

For the reasons stated above, the court should reverse the judgment of the district court, vacate petitioner's state murder conviction, and grant whatever further relief it deems appropriate.

Dated: February 4, 2015                    Respectfully submitted,


                                           RIORDAN & HORGAN
                                           DENNIS P. RIORDAN
                                           DONALD M. HORGAN


                                           By: /s/ Dennis P. Riordan
                                                  Dennis P. Riordan

                                           By: /s/ Donald M. Horgan
                                                  Donald M. Horgan

                                           Attorneys for Petitioner
                                           MARJORIE KNOLLER

## STATEMENT OF RELATED CASES

Petitioner is aware of no related cases pending in this Court.

## CERTIFICATION REGARDING BRIEF FORM

I, Donald M. Horgan, hereby certify that the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 17,318 words.

Dated: February 4, 2015

                         /s/ Donald M. Horgan
                          Donald M. Horgan

CERTIFICATE OF SERVICE
When All Case Participants are Registered for the
Appellate CM/ECF System

I hereby certify that on <u>February 4, 2015</u> I electronically filed the foregoing with
the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit
by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that
service will be accomplished by the appellate CM/ECF system.

Signature:   <u>/s/ Jocilene Yue</u>
Jocilene Yue

*************************************************************

CERTIFICATE OF SERVICE
When <u>Not</u> All Case Participants are Registered for the
Appellate CM/ECF System

I hereby certify that on_____, I electronically filed the foregoing with the
Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by
using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the
appellate CM/ECF system.

I further certify that some of the participants in the case are not registered
CM/ECF users.  I have mailed the foregoing document by First-Class Mail,
postage prepaid, or have dispatched it to a third party commercial carrier for
delivery within 3 calendar days to the following non-CM/ECF participants:

Signature:   _____
Jocilene Yue