14-16449

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**MARJORIE KNOLLER,**

Petitioner-Appellant,

**v.**

**WALTER MILLER, Warden,**

Respondent-Appellee.

On Appeal from the United States District Court
for the Northern District of California

No. C 12-00996 JST
The Honorable Jon S. Tigar, Judge

**APPELLEE'S BRIEF**

KAMALA D. HARRIS
Attorney General of California
PEGGY S. RUFFRA
Supervising Deputy Attorney General
State Bar No. 117315
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-1362
Fax: (415) 703-1234
Email: Peggy.Ruffra@doj.ca.gov
*Attorneys for Respondent-Appellee*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Statement of Issues ...................................................................... 2

Statement of Jurisdiction ............................................................. 3

Statement of the Case .................................................................. 3

Statement of Facts ........................................................................ 5

Standard of Review ...................................................................... 15

Summary of Argument ................................................................. 18

Argument ...................................................................................... 18

   I.    The state court reasonably concluded that any limitation on the right to counsel was not structural error, and that any error was harmless ................................................ 18

       A.   Background ................................................................. 18

          1.   Trial court proceedings ...................................... 18

          2.   California Court of Appeal opinion .................... 22

          3.   District court opinion ......................................... 23

       B.   The state court reasonably concluded that no structural error occurred ............................................ 25

          1.   The state courts' presumptively correct factual finding shows that no interference with the right to counsel occurred ..................... 25

          2.   No clearly established Supreme Court law requires reversal per se ..................................... 29

       C.   The state court reasonably concluded that no prejudicial prosecutorial or judicial misconduct occurred ................................................................... 54

          1.   Prosecutor's closing argument ........................... 54

          2.   Trial court's comments ...................................... 64

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

Conclusion .................................................................................. 65

Statement of Related Cases............................................................ 67

# TABLE OF AUTHORITIES

**Page**

CASES

*Allen v. Woodford*
395 F.3d 979 (9th Cir. 2004) ........................................................... 56, 60

*Arizona v. Fulminante*
499 U.S. 279 (1991)........................................................................ 52, 53

*Barker v. Fleming*
423 F.3d 1085 (9th Cir. 2005) ..................................................................6

*Bell v. Cone*
535 U.S. 685 (2002)........................................................................ 48, 49

*Boyde v. California*
494 U.S. 370 (1990)............................................................................... 59

*Brecht v. Abrahamson*
507 U.S. 619, 317 (1993) ........................................................... 17, 58, 64

*Brooks v. Tennessee*
406 U.S. 605 (1972)............................................................................... 46

*Carey v. Musladin*
549 U.S. 70 (2006)................................................................................. 45

*Castillo v. Florida*
722 F.3d 1281 (11th Cir. 2013) ............................................................ 51

*Caver v. Straub*
349 F.3d 340 (6th Cir. 2003) ................................................................ 41

*Chapman v. California*
385 U.S. 18 (1967)............................................................. 17, 57, 63, 64

*Coleman v. Alabama*
399 U.S. 1 (1970)................................................................................... 47

# TABLE OF AUTHORITIES
## (continued)

Page

*Commonwealth v. Molina*
909 N.E.2d 19 (Mass. 2009).................................................................. 45

*CSX Transp., Inc. v. Hensley*
556 U.S. 838 (2009)............................................................................... 59

*Darden v. Wainwright*
477 U.S. 168 (1986)............................................................ 24, 55, 56, 58

*Davis v. Ayala*
2015 U.S. LEXIS 4059 (June 18, 2015)........................................... 17, 57

*Drayden v. White*
232 F.3d 704 (9th Cir. 2000) ..................................................... 56, 58, 60

*Early v. Packer*
537 U.S. 3, 10 (2002)............................................................................ 54

*Ferguson v. Georgia*
365 U.S. 570 (1961)............................................................................... 47

*Florida v. Nixon*
543 U.S. 175 (2004)............................................................................... 47

*Fry v. Pliler*
551 U.S. 112 (2007)......................................................................... 17, 45

*Fusi v. O'Brien*
621 F.3d 1 (1st Cir. 2010)..................................................................... 47

*Geders v. United States*
425 U.S. 80 (1976)................................................................................. 46

*Glebe v. Frost*
135 S.Ct. 429 (2014)........................................................... 2, 42, 43, 53

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Greene v. Fisher*
132 S.Ct. 38 (2011)..................................................................... 16

*Hamilton v. Alabama*
368 U.S. 52 (1961)....................................................................... 46

*Hammonds v. Newsome*
816 F.2d 611 (11th Cir. 1987) .................................................... 45

*Harrington v. Richter*
562 U.S. 86 (2011)...................................................... 1, 16, 41

*Haynes v. Cain*
298 F.3d 375 (5th Cir. 2002) ..................................................... 45

*Herring v. New York*
422 U.S. 853 (1975)..................................................... 42, 43, 46

*Hicks v. Feiock*
485 U.S. 624 (1988)..................................................................... 63

*Jackson v. Virginia*
443 U.S. 307 (1979)..................................................................... 63

*Liteky v. United States*
510 U.S. 540 (1994)..................................................................... 65

*Lockett v. Trammel*
711 F.3d 1218 (10th Cir. 2013) ................................................. 49

*Lockyer v. Andrade*
538 U.S. 63 (2003)............................................................... 40, 41

*Lopez v. Smith*
135 S.Ct. 1 (2014)....................................................................... 40

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lopez v. Thompson*
    202 F.3d 1110 (9th Cir. 2000) ................................................................ 15

*Marshall v. Lonberger*
    459 U.S. 422 (1983)............................................................................... 27

*Miller v. Martin*
    481 F.3d 468 (7th 2007) ........................................................................ 49

*Moses v. Payne*
    555 F.3d 742 (9th Cir. 2009) ...................................................................5

*Murdoch v. Castro*
    609 F.3d 983 (9th Cir. 2010) ................................................................ 52

*Musladin v. Lamarque*
    555 F.3d 830 (9th Cir. 2009) ................................................................ 52

*Neder v. United States*
    527 U.S. 1 (1999)................................................................................... 53

*Nevada v. Jackson*
    133 S.Ct. 1990 (2013)........................................................................... 40

*Parker v. Matthews*
    132 S.Ct. 2148 (2012)........................................................................... 55

*People v. Fields*
    35 Cal.3d 329 (1983) ............................................................................ 63

*People v. Knoller*
    41 Cal.4th 139 (2007) ................................................................ 4, 60, 61

*People v. Leonard*
    40 Cal.4th 1370 (2007)......................................................................... 63

## TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Snow*
30 Cal.4th 43 (2003) ................................................................. 45

*People v. Stansbury*
4 Cal.4th 1017 (1993) .............................................................. 58

*People v. Valdez*
789 P.2d 406 (Colo. 1990)........................................................ 45

*People v. Vance*
188 Cal.App.4th 1182 (2010) ................................................... 58

*Premo v. Moore*
562 U.S. 115 (2011)........................................................... 44, 54

*Puckett v. United States*
556 U.S. 129 (2009)................................................................. 53

*Redman v. State*
768 A.2d 656 (Md. 2001) ......................................................... 45

*Rivera v. Illinois*
556 U.S. 148 (2009)................................................................. 53

*Roe v. Flores-Ortega*
528 U.S. 470 (2000)................................................................. 28

*Runningeagle v. Ryan*
686 F.3d 758 (9th Cir. 2012) .............................................. 56, 59

*Scarpa v. Dubois*
38 F.3d 1 (1st Cir. 1994).......................................................... 45

*Smith v. Brown*
764 F.3d 790 (7th Cir. 2014) ................................................... 47

# TABLE OF AUTHORITIES
## (continued)

**Page**

*State v. Brown*
  903 A.2d 169 (Conn. 2006) .................................................... 45

*State v. Jeffrey*
  75 P.3d 284 (Kan. 2003) ........................................................ 37

*Takacs v. Engle*
  768 F.2d 122 (6th Cir. 1985) ................................................. 45

*Toomey v. Bunnell*
  898 F.2d 741 (9th Cir. 1990) ................................................. 48

*United States v. Ademaj*
  170 F.3d 58 (1st Cir. 1999) .................................................... 45

*United States v. Cronic*
  466 U.S. 648 (1984) ...................................................... *passim*

*United States v. Gonzalez-Lopez*
  548 U.S. 140 (2006) ...................................................... 52, 53

*Visciotti v. Woodford*
  288 F.3d 1097 (9th Cir. 2002) ............................................... 49

*Washington v. Recuenco*
  548 U.S. 212 (2006) ...................................................... 17, 53

*White v. Maryland*
  373 U.S. 59 (1963) ................................................................ 46

*White v. Woodall*
  134 S.Ct. 1697 (2014) ........................................................... 44

*Williams v. Kaiser*
  323 U.S. 471 (1945) .............................................................. 47

viii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Wisehart v. State*
    693 N.E.2d 23 (Ind. 1998) ...................................................................... 45

*Woodford v. Visciotti*
    537 U.S. 19 (2002) .................................................................................. 16

*Woods v. Donald*
    135 S.Ct. 1372 (March 30, 2015) ................................................. 2, 50, 51

*Wright v. Van Patten*
    552 U.S. 120 (2008) .......................................................................... 49, 50

*Yarborough v. Alvarado*
    541 U.S. 652 (2004) ................................................................................ 42

STATUTES

United States Code, Title 28
    § 2254 ............................................................................................ *passim*

California Penal Code
    § 1118.1 .................................................................................................. 61

CONSTITUTIONAL PROVISIONS

United States Constitution
    Sixth Amendment .......................................................................... *passim*

COURT RULES

Federal Rules of Appellate Procedure
    rule 28-2.2 ................................................................................................ 3

OTHER AUTHORITIES

Antiterrorism and Effective Death Penalty Act of 1996 ............ 16, 24, 44, 45

# INTRODUCTION

The Supreme Court has held that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems.'" *Harrington v. Richter,* 562 U.S. 86, 103 (2011). It is clear that this is not such a case.

The threshold issue is whether any error resulting from the trial court's limitation on defense counsel's ability to object during the prosecutor's closing argument was structural, requiring automatic reversal of appellant Knoller's second degree murder conviction. The state appellate court held that it was not, observing, "We know of no case holding that limiting an attorney's role or ability to object during a portion of the closing argument results in prejudice per se." ER 141. Knoller cites no such case here; instead, she relies on what she calls the "plain meaning" of a footnote in *United States v. Cronic,* 466 U.S. 648, 659 n.25 (1984), which stated that structural error may occur when counsel was "prevented from assisting the accused during a critical stage of the proceeding."

However, the Supreme Court has repeatedly held that *Cronic* must be read narrowly, and that it has clearly established only that a *complete* denial of counsel constitutes structural error. Applying these principles, the district court determined that the state court's interpretation of *Cronic* was reasonable, and two additional Supreme Court cases decided after the district

1

court's decision confirm that result. In *Glebe v. Frost*, 135 S.Ct. 429, 431 (2014) (per curiam), the Supreme Court distinguished the denial of the ability to deliver any closing argument at all from a restriction on closing argument, emphasized that structural errors are limited to those "rare" instances that infect the entire trial process, and concluded that no Supreme Court precedent clearly required the state court to place the improper restriction of closing argument into this "narrow category." In *Woods v. Donald*, 135 S.Ct. 1372, 1377-1378 (2015) (per curiam), the Supreme Court acknowledged that the "precise contours" of *Cronic* are unclear, that none of its cases had confronted the "specific question" presented by the petitioner, and that the state court's holding that *Cronic* did not apply was therefore reasonable. "*Cronic* applies in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' The [state court's] refusal to apply it to these circumstances was not the 'extreme malfunction' required for federal habeas relief." *Id.* at 1378. So too here.

## STATEMENT OF ISSUES

1. Whether the state court reasonably concluded that any error in limiting defense counsel's objections during the prosecutor's closing argument was not structural; and

2

2.  Whether the state court reasonably concluded that the error was harmless.

## STATEMENT OF JURISDICTION

Respondent accepts Knoller's statement of jurisdiction.  *See* Circuit Rule 28-2.2.

## STATEMENT OF THE CASE

On March 27, 2001, the San Francisco grand jury indicted Knoller on charges of second degree murder, involuntary manslaughter, and owning a mischievous animal causing death.  Knoller's husband, Robert Noel, was also indicted on the latter two charges.  The trial court granted defendants' motion for a change of venue, and the joint trial was held in Los Angeles County.  On March 21, 2002, the jury found both defendants guilty as charged.  CR 15, Exh. 1, Clerk's Transcript on first appeal ("CT") 4501-4502, 4601-4602, 4683.[1]

The trial court subsequently granted Knoller's motion for a new trial on the murder conviction, and sentenced her to four years in prison for involuntary manslaughter.  Both Knoller and the People appealed.  On May 5, 2005, in a 2-1 opinion, the California Court of Appeal reversed the order

---

[1] "CR" refers to the Clerk's Record of the district court proceedings; numbers refer to docket entries.  *See* ER 475-477 (docket sheet).

3

granting Knoller a new trial, and upheld the judgment on the remaining counts. ER 150.

The California Supreme Court granted review, limiting the issues to whether the mental state required for implied malice includes only conscious disregard for human life or is satisfied by an awareness that the act is likely to result in great bodily injury, and whether the trial judge abused his discretion in granting the motion for new trial. *People v. Knoller*, 41 Cal.4th 139, 143 (2007). On May 31, 2007, the California Supreme Court held that the court of appeal had set the bar for implied malice too low, but the trial court had set the bar too high. *Id*. at 143. It clarified that the correct standard under California law is that "implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." *Id*. The court remanded the case so the trial court could reconsider Knoller's motion for new trial in light of the correct standard. *Id*.[2]

---

[2] As discussed in more detail below, Knoller continues to make the same argument here regarding what she believes is required for implied malice that she made in the California Supreme Court. *Compare* AOB 15-19 *with* CR 15, Exh. 11 at 23-27. Because the California Supreme Court rejected that view as a matter of state law, the question is no longer subject to debate.

On remand, the trial court denied Knoller's motion for a new trial on the second degree murder charge. CR 15, Exh. 15, Clerk's Transcript on second appeal ("CT II") 415-416. On September 22, 2008, the trial court sentenced her to 15 years to life in prison. CT II 478-481.

Knoller again appealed. On August 20, 2010, the California Court of Appeal unanimously affirmed the judgment. ER 47. On December 1, 2010, the California Supreme Court denied review. ER 297.

On February 27, 2012, Knoller filed a petition for writ of habeas corpus in district court. On July 3, 2014, the district court denied the petition on the merits, and granted a Certificate of Appealability on "Petitioner's Right to Counsel claim." ER 1-46.

## STATEMENT OF FACTS

The trial testimony in this case involved more than 70 witnesses and took a full month to present. The California Court of Appeal's comprehensive summary of the facts spans 37 pages of its opinion, ER 49-86, and is presumed correct. *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009). Our condensed version follows.[3]

---

[3] Our motion for leave to file an oversized brief that quoted this summary of facts was denied. We encourage the Court to review the summary in full, as it is particularly relevant to the prejudice inquiry here.

(continued…)

5

The victim, Diane Whipple, lived with her domestic partner, Sharon Smith, in the same San Francisco apartment building as Knoller and Noel. Knoller and Noel, who were both attorneys, lived and operated their law practice out of their sixth floor apartment, which was down the hallway from Whipple and Smith.

In 1999, Knoller and Noel met Paul "Cornfed" Schneider, an inmate serving a life sentence at Pelican Bay State Prison and a member of the Aryan Brotherhood prison gang. They became enamored of Schneider and wanted to form a "triad," but since they could not enter into a second marriage, they legally adopted him as their "son."

Schneider had asked an acquaintance, Janet Coumbs, to start a dog breeding business with Presa Canario dogs, who were large, fierce "combat and guard" dogs. Coumbs purchased a male, Bane, and three females, Hera,

_____

(…continued)

We note that Knoller relies on the summary of facts in the opinion by the California Supreme Court, AOB 8-15, but because the issues in that appeal concerned only the legal standard for implied malice, that summary is much less detailed. Further, as the district court found, the 2010 opinion by the state appellate court was the last reasoned opinion by the state court, and therefore is the relevant decision to be reviewed by this Court. ER 9; *Barker v. Fleming,* 423 F.3d 1085, 1091 (9th Cir. 2005). Also, Knoller contends the 2010 state appellate court opinion is "a verbatim restatement" of its 2005 opinion, AOB 34, but the 2010 opinion discussed additional cases, did not include a dissent, and made clear that the court found any error harmless beyond a reasonable doubt.

Isis, and Fury. In October 1999, Knoller and Noel filed a lawsuit against Coumbs to obtain custody of the dogs. Coumbs told Knoller that Hera had killed her sheep and her cat; she eventually agreed to turn over the dogs. Before the dogs were transported, Coumbs told Knoller that she thought Hera and Fury should be shot because of their aggression toward people and animals.

Knoller hired a veterinarian, Dr. Martin, to vaccinate the dogs in March 2000. Martin stated that they were "massive dogs" who were "really reacting quite violently." Although he had never done so before in his 49 years of practice, Martin felt professionally compelled to write Knoller a letter warning her about the grave potential danger of the dogs, stating that they "would be a liability in any household."

Nevertheless, in April 2000 Knoller and Noel brought Hera to live in their apartment, and in September 2000 they brought Bane there. Hera weighed approximately 130 pounds, and Bane weighed approximately 150 pounds. Between March and December 2000, over 100 letters were sent between Knoller and Noel, and Schneider and his cell mate Dale Bretches. Among the letters found in Knoller's apartment was a 36-page letter by the inmates detailing a website for the breeding business under the name "Dog-O-War," containing a hand-drawn picture of Bane with the title, "Wardog,

7

Bane," "Bringer of Death: Ruin: Destruction." Also found were 39 copies of a document entitled "Dog-O-War Presas," with a description of the breeding operation, which stated that Presas are "the top protection dog in the world," "naturally protective of their home, family, and each other," and "very dog aggressive."

On October 3, Noel wrote to the inmates:

> I was greeted at the door by Marjorie, Hera and Bane . . . . As I started to come in the door, H and B began competing for my attention, getting more excited with each move by the other. Marjorie, who was holding each by the harness suddenly shot passed me and disappeared down the hall, being propelled forward in the wake of a two Presa team. She let go to keep her footing and the two ran to the end of the hall, turned in unison, each with a look of "We're so fucking cute!!"

On October 8, Knoller wrote to the inmates:

> "Hera Happenings" — Other [than] the bonehead move on Thursday about the food, she is having a good time with Banester. We do take them out separately for walks most of the time as we trained the Pupness to walk off lead most of the time and she is a pain in the butt when you keep her on lead for her whole walk. I take Pupness and Robert takes Banester. Although I have a decent amount of upper body strength, if he really wanted to go after another dog I don't have the body weight or leverage straddling him as Robert does. Even one handed, he is eleven inches (11") taller than I am and at least a good 135 lbs. heavier than I am. Makes a big difference! But as I said before, I had walked him when Robert was not here and I walk him when we go out together, he is excellent on lead.

On October 10, Noel wrote to the inmates:

> I was met at the apt. door by B and H. Each acted as if they had not seen me for years instead of the 4 hours it took to go to and return. When I opened the door 2 Presa faces were immediately pressed into the gap side by side. Before I could get my body in the doorway to block them, they pushed forward into the hall and took off side by side down the hall toward the elevator in a celebratory stampede!! 240 lbs. of Presa wall to wall moving at top speed!!! Up against the wall at the end of the hall, bouncing off, turning and running back the other way bouncing off me and heading to the wall at the other end. Turning again, running back, M snagging H, B taking off up the stairs to the roof door and down and back into the apt.

On January 11, 2001, Noel wrote to the inmates:

> This morning's was an interesting walk—getting used to the "jail break" approach the kids have, break from the door like horses out of the starting gate, stand next to the elevator shifting from one leg to the other to the other etc., the ferocity of the panting directly proportional to how badly the mutt feels he or she needs to go at that point, elevator comes—hopefully with no one in, otherwise they will knock 'em down rushing in. . . . [¶] This morning was one of those days—we get the elevator after one of our neighbors had been dicking around with it—about a 5-minute wait for the kids. We get on, the panting is now anxious. As we reach the 1st floor I see someone standing by the door through the small view hole and tell them to step back. Just at that point the kids hit the door with their snouts, the door blows open and they are nose to nose with the little sheltie collie and obnoxious little white piece of shit that one of our neighbors on 4 has. B'ster and H are into defend mode and I get them back in and we ride back up to 6, send the elevator back down so the dog walker

> can get the other mutts out of the lobby and home.  As
> soon as the door opens at 6, one of our newer female
> neighbors, a timorous little mousy blond[e], who
> weighs less than Hera is met by the dynamic duo exiting
> and all most [sic] has a coronary—the mutts show only
> passing interest as she gets in and goes down.[4]

Numerous witnesses testified that between May 2000 and January 2001, there were at least 30 instances where the dogs ran uncontrolled in the hallway of the apartment building, people observed one or both of the defendants losing control of the dogs, or the dogs exhibited aggression toward other dogs and people, including lunging, growling, and biting.  In September 2000, Noel himself suffered a severe injury to his finger while breaking up a dogfight between Bane and another dog.  He was hospitalized for four days and had two steel pins placed in his hand.

Whipple referred to the Presas as "those dogs."  In early December 2000, Whipple called Smith at work and in a "very panicked voice" said, "That dog just bit me."  When Smith arrived home, Whipple said she encountered Noel in the lobby with one of the Presas, and the dog lunged at her and bit her in the hand.  Smith saw two or three deep, red indentations in the webbing area of Whipple's hand.  Whipple did not seek medical

---

[4] Noel testified at the grand jury that the "timorous little mousy blond[e]" was Whipple.

10

treatment. In the following weeks, Whipple made every attempt to avoid the dogs, checked the hallway before leaving her apartment, and scolded Smith for opening the elevator door without first checking for the dogs. According to Smith, Whipple was "terrified" of the dogs and did "everything she could to get as far away as possible from the dogs."

On January 26, 2001, at about 4:00 p.m., Whipple was attacked and killed. Knoller told Officer Forrestal immediately after the attack that she had just come back from taking the dogs for a walk and had opened her apartment door when she saw Whipple come home with a bag of groceries. Bane ran down the hall and attacked Whipple. Hera ran down the hall after him. Knoller followed and attempted unsuccessfully to intercede. Every time Whipple attempted to get into her apartment, Bane renewed his attack.

The Presas ripped off all of Whipple's clothing, and the hallway was covered with blood. Whipple had 77 discrete areas of injury, which covered her body "from head to toe." She died of multiple traumatic injuries and extensive blunt force trauma resulting in a loss of one-third of her blood.

Knoller had blood on her face and clothing. The sleeve of her sweatshirt had a 2-3" tear, and she had a one inch gash to her right thumb, a small cut to her right index finger, and a bruise developing around her right

11

eye. The thumb injury could have been caused by a dog bite, although it lacked the typical features, and could also have been caused by a nylon leash.

Knoller refused to help animal control officers remove Hera and Bane, stating she was "unable to handle the dogs." Bane was covered in blood, while Hera had some blood on her chest near her right shoulder. Officers removed them with "come-along" poles. Bane was subsequently euthanized. Noel wrote a letter to Schneider that stated, "There is no way to ease in to this—Bane is dead, as is one of our neighbors."

On February 8, 2001, Knoller and Noel appeared on Good Morning America. Noel denied that either dog had ever exhibited any signs of aggression toward people, and Knoller said that the neighbors' reported fear of the dogs was "total fabrication." Knoller said that when she was returning from walking Bane, Whipple had paused at her open apartment door to watch them. Bane became interested in Whipple,[5] jumped up on her, then jumped down, pulling Knoller off her feet. Knoller pushed Whipple into her apartment and fell on top of her. Knoller started pulling Bane out of

---

[5] Knoller testified before the grand jury that Bane had sniffed Whipple's crotch, and suggested he was stimulated by Whipple's scent like a "bitch in heat." Whipple was not menstruating at the time of the attack. Knoller subsequently testified at trial that her interpretation of Bane's behavior was inaccurate.

the apartment when Whipple came out into the hallway again. Knoller got on top of her and Whipple flailed her arms, hitting Knoller in the eye, which caused Bane to attack Whipple. Knoller told the interviewer that she had no responsibility for the attack, and that Whipple could have just slammed the door shut.

Knoller testified at trial over three days. She had the primary responsibility for Hera and Noel had the primary responsibility for Bane. She sometimes walked Bane alone; he was "really calm" and "cooperative" on leash. She "never" walked both dogs together, and the witnesses who testified she did were not correct. Coumbs's statements that she had told Knoller that Hera was aggressive were "lies."

Knoller denied ever seeing Bane or Hera bite, lunge, or act aggressively toward any person. She did acknowledge that Hera would bark at a person who crowded Knoller, and that one time Hera had gotten loose and "charged" Abraham Taylor's dog, but did not "attack" it, and that incident happened because Knoller was "careless and inattentive."[6] Knoller maintained that witnesses Bardack, Pristel, Edelman, Lu, Harris, Moser,

---

[6] Taylor testified that he was walking a dog on the street when he encountered Knoller and Noel walking Hera and Bane. Hera pulled the leash from Knoller's hands, charged Taylor's dog, and tried to bite it. Taylor was able to grab Hera's harness and forced her to the ground.

Davis, Wertman-Tallent, and Cooley had all given "false" accounts about the incidents involving Bane, Hera, or both. She called Noel's letter about the dogs pulling her down the hallway an "exaggerat[ion.]" Other than the one incident with Taylor's dog and Hera, Knoller claimed there was no other incident where she had lost control of the dogs prior to Whipple's death. Knoller denied having any knowledge that Bane could ever kill a person, stating, "how could you anticipate that a dog that you know that is gentle and loving and affectionate would do something so horrible and brutal and disgusting and gruesome to anybody?"

Knoller testified that on January 26, 2001, she had taken Bane out without a muzzle. She was returning and noticed Whipple standing by her open doorway with grocery bags on the floor. Knoller opened her door and entered with Bane, but Bane backed out into the hallway and moved toward Whipple. Knoller engaged in a prolonged tug of war with Bane where she tried to get him to return to the apartment that lasted for over a minute, while Whipple remained in the doorway watching the struggle. Bane pulled Knoller off her feet, and Hera followed down the hall. Bane jumped up on Whipple and Knoller tugged him down. Knoller pushed Whipple into her apartment, causing Whipple to fall face down. Knoller fell on top of her, told her not to move, and crawled out of the apartment, pulling Bane with

14

her.  Whipple did not shut her door, but came back out into the hallway.

Bane lunged at Whipple and Knoller again got on top of her.  Whipple

flailed her arms and struck Knoller in the eye.  Bane then bit Whipple in the

neck.  Knoller attempted to maneuver Whipple toward the elevator by

"shimmying down the hallway" with Whipple underneath, but Bane

continued to attack Whipple.  Bane bit Knoller, but did not break the skin.[7]

Knoller was finally able to pull Bane off Whipple, but Whipple was bleeding

profusely by that point.  Knoller got Bane into her apartment and Hera

followed.  Knoller intended to render first aid to Whipple, but left her in

alone in the hallway.  Knoller never called 911.

Knoller admitted that many of the details of her trial testimony differed

from what she told the officers who responded to the scene, and from her

grand jury testimony.  She admitted that she had fought to keep Hera alive

and took the case all the way to the California Supreme Court.

## STANDARD OF REVIEW

This Court reviews de novo the district court's denial of the petition.

*Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc).

---

[7] A dog behavior expert testified on rebuttal that a dog who is in the
middle of an attack is not able to differentiate between people or exercise
bite inhibition, as demonstrated by the fact that Bane bit Noel's finger when
Noel interfered in the dogfight.

The Court reviews the state court's ruling under a "highly deferential" standard imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). The federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," Supreme Court law that was "clearly established" at the time the state court adjudicated the claim on the merits. 28 U.S.C. § 2254(d)(1). "'[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'" *Harrington v. Richter*, 562 U.S. at 101, citation omitted.

To obtain federal habeas relief, a petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. This high standard is meant to be "difficult to meet," because "the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 132 S.Ct. 38, 43 (2011), citations omitted.

16

Even if constitutional error occurred, "most constitutional errors can be harmless," and "[o]nly in rare cases has [the Supreme] Court held that an error is structural." *Washington v. Recuenco*, 548 U.S. 212, 218 (2006). In *Davis v. Ayala*, 2015 U.S. LEXIS 4059 (June 18, 2015), the Supreme Court recently clarified that a state court's determination that a constitutional error is harmless under *Chapman v. California*, 385 U.S. 18 (1967), constitutes an adjudication on the merits that is subject to AEDPA deference. Thus, habeas relief is unavailable unless the state court applied *Chapman* in an objectively unreasonable manner. *Id*. at *21. In addition, "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht* [*v. Abrahamson,* 507 U.S. 619, 317 (1993)]," which requires a showing that the error had a substantial and injurious effect on the verdict. *Id.* Formal application of both tests is not necessary where the error is plainly harmless under the more stringent *Brecht* test, which subsumes the more liberal unreasonable application of *Chapman* test. *Id*. at *19-22; *Fry v. Pliler*, 551 U.S. 112, 119-120 (2007). Thus, if the federal habeas court finds either that the state court's *Chapman* holding was reasonable or that the error was harmless under *Brecht*, it may stop there. If the federal habeas court finds that the state court's *Chapman* holding was unreasonable, it must also consider whether there was prejudice under the *Brecht* standard.

17

## SUMMARY OF ARGUMENT

The state court reasonably concluded that any limitation on the right to counsel was not structural error, in light of the Supreme Court's repeated admonitions that *Cronic* applies narrowly only to a complete deprivation of counsel. Even assuming the trial court's order actually caused defense counsel not to object, the state court reasonably concluded that the error was harmless under the circumstances and in light of the strong evidence of guilt.

## ARGUMENT

### I. THE STATE COURT REASONABLY CONCLUDED THAT ANY LIMITATION ON THE RIGHT TO COUNSEL WAS NOT STRUCTURAL ERROR, AND THAT ANY ERROR WAS HARMLESS

Knoller contends that she was denied the right to counsel as the result of the trial court's limitations on defense counsel's objections during the prosecutor's closing argument, and that the error was structural, or alternatively that it was prejudicial.

#### A. Background

##### 1. Trial Court Proceedings

During the closing argument by Knoller's defense counsel, Nedra Ruiz, the prosecutor objected that Ruiz was arguing that evidence that had been admitted for a limited purpose should be considered for the truth of the

matter asserted. The trial court agreed, and reminded the jury that the

evidence could not be considered for its truth. ER 424-425.

During the prosecutor's rebuttal argument, the following exchange

occurred, when the prosecutor was responding to counsels' arguments that

no one had ever complained to officials about the dogs' conduct.

> [Prosecutor:] One witness stood up there and said when
> Ms. Ruiz pressed her why didn't you complain, why
> didn't you say something to Mr. Noel, remember that,
> and she said he's got 240 pounds of dog on him, you
> want me to walk up to him – and he can't control them.
> You want me to go up to him and complain and show
> you – [8]
>
> Ms. Ruiz: Misstates the evidence, your honor.
>
> The Court: Counsel, this is closing argument. There
> will be no further interruptions or you will be out of the
> courtroom.

ER 443-444, footnote added.

Shortly thereafter, the prosecutor argued as follows:

> [Prosecutor:] [D]id they know about the danger? We
> have already talked about this, about the control and
> about what would happen if they got loose, and did she

---

[8] This referred the testimony of Violetta Pristel, who stated on cross-examination: "I would have liked to have talked to [Noel], but I was – I felt intimidated by him; pretty freaked out, actually, because he was with these big dogs and I was scared of them. And every time I saw him he was with them, so I wasn't – I didn't feel comfortable complaining to him. . . ." CR 15, Exh. 2, Reporter's Transcript ("RT") 3471-3472.

consciously disregard it?  The evidence, and it's uncontradicted, is that time and time again they were warned wear a muzzle, put a choke collar on and they said in Mr. Noel's words I can do whatever I god damn please, I can go to any park I want with the dog off-leash. [9]

Ms. Ruiz:  Objection, your honor.  The dog was on leash at all times.

The Court:  Counsel, there will be no further objections. The jury will recall the evidence.

Ladies and gentlemen, it is improper and counsel's conduct is improper by standing up in closing argument and objecting to her recollection of what the evidence was. The jury will recall what the evidence is. Arguments of counsel are not evidence and it is improper.

And, Ms. Ruiz, please take your seat now and not get up again or the next objection will be made from the holding cell behind you.

---

[9] This referred to the testimony of Cathy Brooks, who explained that when she encountered Noel walking Bane on leash in an off-leash park, the following discussion occurred:  "Well, my dog was off leash and he was kind of running around and has a tendency to run up to other dogs as dogs will do to greet each other, and the gentleman said 'you better call your dog, my dog is not friendly.' . . . I commented to him that – If the dog was aggressive and had a problem with people or with dogs, and he was in the off-leash area of the park, why wasn't the dog muzzled, why did the dog not have a pincher choke collar on, something that would be an appropriate method of restraint, why did he have a halter on the dog and why was he walking in an area where, you know, any dog could run to him because it was a legal off-leash area of the park. . . . [He responded] that he could walk his dog wherever he goddamn well pleased."  CR 15, Exh. 2, RT 3365-3366.

> Ladies and gentlemen, counsel are entitled to argue
> what they believe the evidence is. If they are wrong, the
> jury will recall that. What counsel say the evidence is,
> is not the evidence. And it is not a proper objection to
> stand up in the middle of closing argument and insert
> your own interpretation of what the evidence is.

ER 460-461, footnotes added. Neither Ruiz nor Noel's counsel objected

during the remainder of the prosecutor's rebuttal argument.

Subsequently, at the motion for new trial, Knoller argued that she was

denied the right to counsel during closing argument. The trial court stated:

> During the course of [the prosecutor's] rebuttal on
> March 19th, where I was watching them, the court had
> caught – and this was independently verified by security
> staff down in Los Angeles. I was caught by a
> substantial amount of noise coming from the defense
> table and I looked over and Ms. Knoller and Ms. Ruiz
> were engaged in a very animated discussion with a lot
> of waving of hands which included on the part of Ms.
> Knoller the "Get up, get up, get up," the waving of arms
> going up like that (indicating) and suddenly in the
> middle . . . . Ms. Ruiz for perhaps the second time in the
> trial did not make a speaking objection. She simply
> stood up and said "Misstates the evidence." It's the
> court's view that was an improper objection. The
> evidence that she was talking about was virtually
> impossible to identify and it was the court's view--and
> this was independently corroborated by security staff, . .
> . who was so concerned about the amount of noise that
> he got up to stand over there because he was afraid that
> something was going to happen. The waving of hands,
> the "stand up," it appears to this court that this was an
> objection inserted into the record for the purposes of
> interrupting the flow of the prosecution's rebuttal
> argument and nothing more than that.

The second objection, whether or not – again, it was nonresponsive to what was being stated. The argument – and this is the one that appears at 5396 – states simply that Mr. Noel had stated "I can do whatever I goddamn please, I can go to any park I want with the dogs off leash." The objection was "The dog was on leash at all times." That's nonresponsive to the comment that was just made. There was no argument that the dog was off leash, it was an argument and it was an argument groundly supported by the record that Mr. Noel had taken the position that he could go off leash if he wished to do so.

This was a second objection which appeared to the court more to be - more designed to interrupt the flow of the prosecution's rebuttal argument than anything else. And the court was quite stern with Ms. Ruiz. The court indicated that there would be no further objections. I wish I had inserted the word "improper" in there, I didn't, but my description to the jury afterwards of why it is not proper for counsel to stand up in the middle of an argument and dispute a rather small technical point of evidence, I certainly suggested that Ms. Ruiz remain in court and was free anytime under the obligation to insert whatever objections she deemed appropriate on behalf of her client. She was never removed. And this should be considered a compliment to Ms. Ruiz. I do not believe that she would be at all cowered into silence by any of my comments made from the bench.

ER 311-313.

## 2. California Court of Appeal Opinion

The California Court of Appeal rejected Knoller's claim that she was denied the right to counsel. As discussed in more detail below, the state

appellate court found that Ruiz was not in fact intimidated into refraining from objecting by the trial court's order; that even if she was, the error was not structural; that most of the comments made during the final portion of the prosecutor's argument were proper, and those that were not were harmless beyond a reasonable doubt; and that the judge's comments were harmless beyond a reasonable doubt. ER 130-148.

### 3.    District Court Opinion

The district court rejected Knoller's claim that the "plain meaning" of the phrase "prevented from assisting the accused" in footnote 25 of *Cronic* clearly established a rule requiring habeas relief whenever counsel is prevented from assisting a defendant in any way during the course of a trial. ER 14. The district court found that the meaning of that phrase was "not self-explanatory," "not particularly illuminating," and not "susceptible of only one interpretation." ER 23. Other statements in *Cronic* itself, along with additional Supreme Court cases discussing the spectrum of structural error, demonstrated that *Cronic* did not define precisely what types of interference warrant per se reversal. ER 24. The district court held that Knoller's proposed "bright line" rule that "any wrongful interference with counsel's assistance of a client, however brief or slight, requires per se reversal," was not supported by Supreme Court precedent, which confines

23

structural error to "a very limited class of cases." Knoller's approach would require per se reversal of many convictions. ER 23. Further, Knoller did not argue that her case was analogous to the facts of *Cronic* or any other Supreme Court case, and the facts of this case distinguished it from the cases triggering automatic reversal. ER 23, 25.

The district court found that the state appellate court had carefully reviewed the Supreme Court's cases and correctly concluded that the interference here fell short of the kind of interferences within the "very limited class" of cases requiring automatic reversal. ER 25. The state appellate court was properly guided by Supreme Court cases discussing structural errors, which defy analysis by harmless-error standards because they affect the framework within which the trial proceeds. ER 25 n.4. "Measured against the high standard of review under AEDPA," the state appellate court's conclusion that no structural error occurred was neither unreasonable nor contrary to clearly established Supreme Court precedent. ER 26-27.

The district court further found that the error was harmless under *Brecht*. The prosecutor's comments inviting the jury to "think" of the victim did not approach the magnitude of the misconduct that was upheld in *Darden v. Wainwright,* 477 U.S. 168 (1986). ER 28-29, 31. In addition, the

24

jury was instructed not to be swayed by sympathy, passion, or prejudice, and was reminded that arguments of counsel are not evidence. ER 29. The district court also held that the prosecution had introduced "voluminous evidence going to Petitioner's state of mind" and that the evidence of guilt of second degree murder was strong. ER 30-31. Finally, the district court determined that the trial court's comments were not prejudicial.[10]

**B.  The State Court Reasonably Concluded That No Structural Error Occurred**

**1.  The State Courts' Presumptively Correct Factual Finding Shows That No Interference With the Right to Counsel Occurred**

The California Court of Appeal's primary holding was that, "[e]ven if we presume Ruiz did refrain from making any further objections during the prosecutor's rebuttal closing argument as a result of the court's oral order," Knoller was not deprived of the right to the assistance of counsel requiring reversal per se. ER 133. However, the state appellate court initially observed that the trial court's order did not "unambiguously silence" Ruiz,

---

[10] The district court noted that its opinion upholding the judgment "should not be read as an endorsement of any aspect" of the trial court's order, which it found "erroneous and inappropriate." ER 34 n.8. Likewise, the California Attorney General's Office does not condone the order. However, as the district court acknowledged, the question before this Court is not whether the order was proper, but the "markedly different" question of whether Knoller is entitled to habeas relief. *Id.*

because immediately after the court told Ruiz not to object further it explained to the jury that her conduct was "improper," thus a reasonable attorney would have interpreted the court's order as precluding any further improper objections. ER 133 n.25. The state appellate court also found that, even if the order could be construed to forbid any further objections, it did not actually cause Ruiz to refrain from objecting as a result. The trial court's warning just minutes earlier that Ruiz would be "out of the courtroom" if she made any further interruptions "had no effect on silencing Ruiz," and Ruiz also had purposefully violated an earlier gag order that was sanctionable by contempt. *Id.*; *accord* ER 313-314 (trial court stated that, based on its "personal observation" of the event, "I do not believe that she would be at all cowered into silence by any of my comments made from the bench."). The state appellate court also noted that Ruiz had "engaged in extremely disruptive behavior throughout the trial," including writhing on the floor and improperly telling the jury that the victim was a lesbian by stating that charges were only brought against her client to "curry favor with the homosexual community." ER 138-139 & n.27.[11]

---

[11] The trial court repeatedly warned Ruiz to desist from improper conduct throughout the trial. CR 15, Exh. 2, RT 870-871, 2925-2926, 3062, 3605, 3642, 3690, 4126, 4338, 4465, 4754, 4799, 4952, 5090. After trial,
(continued…)

This factual finding by the state trial and appellate courts is presumed correct under 28 U.S.C. § 2254(e)(1), and can only be rebutted by clear and convincing evidence. Credibility findings based on first-hand observations are particularly insulated, because federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 433-434 (1983). The factual finding shows that the trial court's order did not actually cause Ruiz's lack of objection during the last portion of the prosecutor's rebuttal argument.[12] The trial and appellate courts expressly found that Ruiz was not in fact "cowed into foregoing her duty to her client" by the trial court's order. If that is the case, Knoller was not deprived of the

---

(…continued)
the court held a hearing on whether Ruiz should be found in contempt for violating the gag order. RT 5465-5483. Ruiz had appeared on national television and said that Whipple's partner, Sharon Smith, was a liar. RT 5479-5480. At the contempt hearing, Ruiz admitted she had deliberately violated the gag order, stating, "even though I had a duty to the Court to abide by the Court's rulings and I realized that these rulings concerning comments of parties were based upon the Court's desire to make a fair trial, it seemed to me that as more and more days went by, the vilification of my client's character had reached such a point that I had a duty to speak out in her defense." RT 5470. The trial court found that Ruiz had violated the order but was not in contempt and fined her $750. RT 5482.

[12] Knoller addresses only whether the trial court's order was "ambiguous." AOB 40-42. We rely on the separate factual finding that, even if the order was *not* ambiguous, it did not intimidate Ruiz.

right to counsel, and there was no Sixth Amendment error. *See Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000) (counsel's performance must "actually cause" Sixth Amendment violation).

The district court held that the state courts' factual finding was unreasonable, because it believed there was "no factual basis" for the conclusion that the order did not have the effect of silencing Ruiz. The district court stated that "[a]ny reasonable lawyer in Ruiz's position" would have concluded that to object further was to risk being escorted from the courtroom and into a holding cell, and that the state appellate court had not pointed to anything in the record showing that Ruiz was prepared to take that risk. ER 33. However, the state courts found that Ruiz herself was *not* a reasonable lawyer; thus, the question from an objective standpoint is irrelevant. Moreover, the state appellate court specifically cited a number of examples demonstrating that Ruiz was prepared to flout the trial court's order. First, Ruiz failed to comply with the trial court's initial order not to interrupt or she would be out of the courtroom; "[t]his stern warning apparently had no effect because Ruiz, very shortly thereafter, objected again on the same basis." ER 147. Second, Ruiz "had shown a complete disregard for other court orders, even when such orders stated that a violation would result in contempt," because she believed her duty to her

28

client overrode her duty to abide by the court's rulings.  ER 138-139; *see ante,* n. 11.  And third, Ruiz had "engaged in extremely disruptive behavior throughout the trial," despite the trial court's repeated warnings to desist.  ER 139.  Accordingly, the state courts' factual finding was clearly supported by the record and has not been rebutted.

Nevertheless, as noted above, the state appellate court analyzed the Sixth Amendment claim after assuming that Ruiz did refrain from making further objections as a result of the order.  ER 133.  Accordingly, this Court need not reach the factual finding issue unless it finds the state court's decision contrary to or an unreasonable application of Supreme Court law.

### 2. No Clearly Established Supreme Court Law Requires Reversal Per Se

The California Court of Appeal conducted an extensive review of the relevant United States Supreme Court law and concluded that it was required to apply harmless error analysis here, because the Supreme Court has not held that a limitation on counsel that does not amount to a complete deprivation constitutes structural error.  The court stated:

> The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel during critical stages of the proceedings.  (*Herring v. New York* (1975) 422 U.S. 853, 857 (*Herring*) [trial judge's order denying counsel opportunity to make summation at close of bench trial denied defendant assistance of counsel].)

Closing argument is a critical stage of a criminal trial and the complete deprivation of the right to counsel at the defendant's closing argument requires reversal per se. (*Ibid*.) However, in the present case, defendant had counsel for the prosecution's closing argument, for her closing argument, and for most of the prosecution's rebuttal closing argument.

The Constitution "entitles a criminal defendant to a fair trial, not a perfect one." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.) "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." (*Morris v. Slappy* (1983) 461 U.S. 1, 11.) It is well settled that "'most constitutional errors can be harmless.' [Citation.] '[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' [Citation.] Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' [Citations.]" (*Neder v. United States* (1999) 527 U.S. 1, 8, criticized on other grounds in *People v. McCall* (2004) 32 Cal.4th 175, 187, fn. 14.)

Constitutional violations that defy harmless-error review contain "a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' [Citation.] Such errors 'infect the entire trial process,' [citation], and 'necessarily render a trial fundamentally unfair,' [citation]. Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.' [Citation.]" (*Neder v. United States, supra*, 527 U.S. at pp. 8-9.)

30

In our first opinion, we cited *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*), and concluded that the holding in *Cronic* required us to apply the harmless error analysis to this record. The United States Supreme Court stated in *Cronic* that the defendant is not entitled to perfect assistance and is only deprived of his or her Sixth Amendment right to effective assistance when the trial process "loses its character as a confrontation between adversaries . . . ." (*Id*. at pp. 656-657, fn. omitted.) The most obvious example is "the complete denial of counsel" "at a critical stage." (*Id*. at p. 659.) The *Cronic* court did not state that a limitation on counsel "during" a critical stage constitutes structural error.

The holding in *Cronic, supra*, 466 U.S. at pages 658-662, has been reiterated by the United States Supreme Court in *Bell v. Cone* (2002) 535 U.S. 685, 696 (*Bell*). The United States Supreme Court in *Bell* explained that it "identified three situations implicating the right to counsel [in *Cronic*] that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' [Citation.] [¶] First and '[m]ost obvious' was the 'complete denial of counsel.' [Citation.] A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at 'a critical stage,' [citation], . . . [Fn. omitted.] Second, we posited that a similar presumption was warranted if 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.' [Citation.] Finally, we said . . . where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected." (*Bell, supra*, 535 U.S. at pp. 695-696.)

Under *Cronic* and *Bell* prejudice is presumed only under the most egregious conditions.  Prejudice is presumed when the state interferes to the extent there is

a complete deprivation of counsel during a critical stage of the proceeding. In addition, error by counsel may be presumed in the rare circumstances when counsel's actions undermined the reliability of the finding of guilty, such as, when counsel repeatedly slept through the guilt phase of the trial (e.g., *Burdine v. Johnson* (5th Cir. 2001) 262 F.3d 336, 345), counsel was intoxicated during the entire trial (e.g., *State v. Keller* (1929) 57 N.D. 645 [223 N.W. 698]), or counsel had an actual conflict of interest affecting performance (*Cuyler v. Sullivan* (1980) 446 U.S. 335). In the present case, we are only concerned with the state's interference causing the actual or constructive complete deprivation of counsel.

Defendant maintains that the standard set forth in *Cronic* and *Bell* was modified in *Gonzalez-Lopez, supra*, 548 U.S. 140, which was decided after we issued our first opinion in this matter. The court in *Gonzalez-Lopez* announced the following rule: "Where the right to be assisted by counsel of one's choice is wrongly denied . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." (*Id*. at p. 148.)

Contrary to defendant's assertion, *Gonzalez-Lopez* did not refine or change harmless-error analysis for ensuring a fair trial under the Sixth Amendment. The court in *Gonzalez-Lopez, supra*, 548 U.S. 140, explained that the right to select counsel of one's choice has never been derived from the Sixth Amendment's purpose of ensuring a fair trial, but has "been regarded as the root meaning of the constitutional guarantee." (*Id*. at pp. 147-148.) When a court erroneously refuses to permit a defendant to select his or her attorney for the entire trial, on appeal, prejudice need not be shown because the "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being

represented by the lawyer he wants, regardless of the quality of the representation he received." (*Id*. at p. 148.)

Defendant contends that the court in *Gonzalez-Lopez* disapproved of the fundamental test for structural error that we used in our prior opinion. Defendant's contention is simply not correct. The court in *Gonzalez-Lopez* explained that there were two different types of errors: The first type of error occurs " 'during presentation of the case to the jury' " and its effect "may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [the error was] harmless beyond a reasonable doubt.' " (*Gonzalez-Lopez, supra*, 548 U.S. at p. 148.) The second type of constitutional error is structural defects and they defy harmless error standard because they " 'affect [t]he framework within which the trial proceeds,' " and are not 'simply an error in the trial process itself.' " (*Ibid*.) The court concluded that the "erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error." ' " (*Id*. at p. 150.)

The *Gonzalez-Lopez* decision impacts those cases where the court at the beginning of trial erroneously refused to permit the defendant to have his or her counsel of choice and a different attorney provided the defendant with representation throughout the trial. That is clearly not the situation here and *Gonzalez-Lopez* is not applicable to defendant's appeal. Indeed, the definition of structural error used in *Gonzalez-Lopez* is precisely the one we applied in our prior opinion.

The situation before us does not approximate the situation in *Gonzalez-Lopez* or any of the other cases where a court has held that there is prejudice per se based on, actual or constructive, complete deprivation of counsel. Courts have concluded that there is actual or

constructive complete deprivation of counsel as a result
of the state's actions in the following situations: counsel
for defendant was prevented from giving any closing
argument (e.g., *Herring, supra*, 422 U.S. at p. 857); no
counsel was appointed for an indigent defendant in a
robbery prosecution (*Gideon v. Wainwright* (1963) 372
U.S. 335); the defendant was prevented from consulting
counsel "about anything" during a 17-hour overnight
recess (*Geders v. United States* (1976) 425 U.S. 80); the
state law required the defendant to testify first or not at
all, which deprived the defendant of "the 'guiding hand
of counsel' " in the timing of this critical element of the
defense (*Brooks v. Tennessee* (1972) 406 U.S. 605); the
attorney was barred from conducting any direct
examination of the client (*Ferguson v. Georgia* (1961)
365 U.S. 570); the defendant was deprived of any
counsel during the supplemental instruction to the jury
(*French v. Jones* (6th Cir. 2003) 332 F.3d 430); counsel
was prevented from arguing an entire theory of the
defense (e.g., *Conde v. Henry* (9th Cir. 1999) 198 F.3d
734, 739); counsel was stopped from cross-examining a
particular witness (e.g., *Davis v. Alaska, supra*, 415 U.S.
at pp. 317-318); the defendant had no counsel at his
arraignment in a capital case (*Hamilton v. Alabama*
(1961) 368 U.S. 52, 55); the defendant had no counsel
when he entered a guilty plea at the preliminary hearing,
and this initial plea was introduced into evidence at the
defendant's trial (*White v. Maryland* (1963) 373 U.S. 59,
60); and the defendant had requested counsel but did
not receive any at the time he was convicted and
sentenced (*Williams v. Kaiser* (1945) 323 U.S. 471).

The cases cited in *Cronic, supra*, 466 U.S. at page 659,
"involve instances where something having to do with
the truth-seeking process was prevented by court ruling,
or where the part to be played in that process by defense
counsel was *wholly* absent." (*Green v. Arn* (6th Cir.
1987) 809 F.2d 1257, 1265, italics added.) The case
before us differs significantly from these rare cases that

34

have reversed for structural error as the truth-seeking or adversarial process was not significantly frustrated. Ruiz was not precluded from giving any part of her closing argument (e.g., *Herring, supra*, 422 U.S. at p. 857), from arguing an entire theory of the defense (e.g., *Conde v. Henry, supra*, 198 F.3d at p. 739), from communicating with her client (e.g., *Geders v. United States, supra*, 425 U.S. 80), or from cross-examining a particular witness (e.g., *Davis v. Alaska, supra*, 415 U.S. at pp. 317-318).

At best, the court limited Ruiz's ability to object during the last part of the prosecution's closing rebuttal argument. The *Herring* court clarified that the judge retains the power to control the courtroom, including limiting or interfering with the attorney's argument: "This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion." (*Herring, supra*, 422 U.S. at p. 862.) Here, the judge did not threaten Ruiz with being placed in the holding cell until after she had completely flouted his prior orders, including his admonition minutes earlier that if she continued to interrupt, she would be out of the courtroom.

Indeed, the trial court has the authority to control the courtroom. Here, it needed to control Ruiz who had defiantly ignored its warning that further interruptions would result in her being banished from the courtroom and who had shown a complete disregard for other court

35

orders, even when such orders stated that a violation would result in contempt.[13]

Although not exactly the issue presented here, our Supreme Court has made clear that a ruling that adversely affects the defense's closing argument does not necessarily result in prejudice per se. Our Supreme Court specified that to the extent that *In re William F.* (1974) 11 Cal.3d 249, "a case in which no argument at all was permitted[,] implies that error adversely affecting defense counsel's closing argument necessarily infringes on the defendant's constitutional right to the assistance of counsel [citation], it is unsound and is hereby disapproved." (*People v. Bonin* (1988) 46 Cal.3d 659, 695, fn. 4, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Here, defense counsel's closing argument was not affected. Only her ability to object to the last fraction of the prosecutor's rebuttal closing argument was arguably impacted.

Rather than point to any case that resulted in per se reversal under conditions similar to the situation present here, defendant cites to contempt cases. . . . In any event, these contempt cases are essentially irrelevant to the issue before us. As already stressed, the complete deprivation of counsel is structural error because "the

---

[13] We note that the trial court exhibited significant patience in dealing with defendant's counsel who had engaged in extremely disruptive behavior throughout the trial that included, but was not limited to, writhing on the floor during the trial, purposefully disobeying a prior gag order, improperly telling the jury that the victim was a lesbian by stating that charges were only brought against her client "to curry favor with the homosexual community," and disregarding the court's prior admonitions not to interrupt.

entire conduct of the trial from *beginning to end* is obviously affected by the absence of counsel for a criminal defendant . . . ." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 307, 309-310, italics added.) A constitutional deprivation is a structural defect "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (*Id.* at p. 310, see also *People v. Bonin, supra*, 46 Cal.3d at p. 695.) We know of no case holding that limiting an attorney's role or ability to object during a portion of the closing argument results in prejudice per se.[14] Ruiz [sic] does not argue that she was foreclosed from raising a defense, from presenting an argument, or from objecting throughout the entire critical stage of closing argument. Rather, her sole complaint is that she suffered prejudice because, subsequent to her being told to stop objecting, the prosecutor improperly appealed to the jurors' passions and prejudice. Such a complaint is an issue of prejudice easily addressed by a harmless error analysis and does not approach the level of establishing that her trial was so fundamentally unfair that the court's actions undermined the reliability of the finding of her guilt. (See, e.g., *People v. Hill, supra*, 17 Cal.4th at pp. 844-847.)

Defendant ignores the warning in *Cronic* that the defect "at the critical stage" must undermine the entire adversary process (*Cronic, supra*, 466 U.S. 657), and

---

[14] We are aware of a Kansas decision where the court instructed counsel to stop objecting during closing argument. (*State v. Jeffrey* (Kan. 2003) 75 P.3d 284.) The reviewing court concluded that the defense counsel had made two proper objections when the court prohibited further objections. (*Id.* at p. 290.) The reviewing court applied a harmless error analysis. (*Id.* at p. 292.)

maintains that any limitation on counsel during a critical stage results in reversal per se. She quotes the following footnote in *Cronic*: "The court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (*Id*. at p. 659, fn. 25.) According to defendant, the court "prevented" Ruiz from assisting her by ordering Ruiz not to object any further during the last portion of the prosecution's rebuttal closing argument or she would be doing it from the holding cell. In a footnote, the United States Supreme Court in *Bell v. Cone* has explained the meaning of this footnote in *Cronic*. (*Bell, supra*, 535 U.S. at p. 696, fn. 3.) The court clarified that this footnote states that no prejudice needs to be shown when the criminal defendant "had actually or constructively been denied counsel [at a critical stage] by government action." (*Ibid*.) As discussed, *ante*, the court expressly stated that the holding in *Cronic* is that the state's action must result in the actual or constructive " 'complete denial of counsel.' " (*Bell, supra*, at p. 696, italics added.)

Here, harmless error applies in a situation where counsel objected all through trial and throughout most of the closing argument. As already highlighted, this is not a situation where Ruiz was barred from making an objection during the entire closing argument,[15] nor was she in any way barred from making a motion or presenting evidence regarding a defense. Rather, this is a situation where the court instructed her not to interrupt any further or she would be expelled and placed in the holding cell. Rather than structural error, this situation

---

[15] We express no opinion as to whether the complete foreclosure of objections during closing argument could result in structural error.

is similar to when a reviewing court considers the erroneous overruling of an objection during closing rebuttal argument or considers prosecutorial or judicial misconduct when objecting would be futile (see, e.g., *People v. Hill, supra*, 17 Cal.4th at pp. 844-847). Under both of these circumstances, it is well settled that the reviewing court applies a harmless error analysis.

At best, defendant could argue that it was futile for her attorney to object during the final moments of the closing rebuttal argument, but automatically reversing the judgment on this basis contravenes our Supreme Court's precedent. Our Supreme Court has applied the harmless error analysis in a situation where the attorney did not object to the alleged prosecutorial misconduct throughout the trial because the judge had made it clear that such objections would be denied and ridiculed. (*People v. Hill, supra*, 17 Cal.4th at pp. 821-822, 844-847 [counsel could infer from trial court's prior rulings and comments that it disfavored additional interruptions during the questioning of witnesses or during closing argument and therefore Supreme Court applied harmless error to alleged prosecutorial misconduct].)

"[T]he harmless-error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" (*Arizona v. Fulminante, supra*, 499 U.S. at p. 308.) "Correctly applied, harmless error and structural error analyses produce identical results: unfair convictions are reversed while fair convictions are affirmed. Expanding the list of structural errors, however, is not mere legal abstraction. It can also be a dangerous endeavor. There is always the risk that a sometimes-harmless error will be classified as structural, thus resulting in the reversal of criminal

> convictions obtained pursuant to a fair trial. Given this
> risk, judges should be wary of prescribing new errors
> requiring automatic reversal. Indeed, before a court
> adds a new error to the list of structural errors (and
> thereby requires the reversal of every criminal
> conviction in which the error occurs), the court must be
> certain that the error's presence would render every such
> trial unfair." (*Sherman v. Smith* (4th Cir. 1996) 89 F.3d
> 1134, 1138.)

ER 133-143, one footnote omitted, remaining footnotes renumbered.

The "threshold question" before this Court under 28 U.S.C. §
2254(d)(1) is whether the Supreme Court has "clearly established" a specific
rule that a limitation on counsel's ability to object during the prosecutor's
closing argument constitutes a violation of the right to counsel that amounts
to structural error. *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). The
Supreme Court has repeatedly held that the "clearly established"
requirement must be interpreted narrowly. *E.g., Lopez v. Smith,* 135 S.Ct. 1,
4 (2014) (per curiam) (Supreme Court cases holding that defendant is
entitled to notice of charges were "far too abstract to establish clearly the
specific rule respondent needs," which was that defendant is entitled to
notice of the possibility of conviction based on aiding and abetting); *Nevada
v. Jackson,* 133 S.Ct. 1990, 1994 (2013) (per curiam) (Supreme Court cases
holding that restrictions on cross-examination may violate the Confrontation
Clause did not clearly establish a right to present extrinsic evidence to

40

impeach credibility, which would frame the Supreme Court's precedents at too high a level of generality); *Andrade*, 538 U.S. at 76 (where the "precise contours" of Supreme Court cases were "unclear," state court's application of that rule was not unreasonable).  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Richter*, 562 U.S. at 101.

Knoller's proposed rule is that the "plain meaning" of footnote 25 of *Cronic* clearly established that a trial court's order that "prevented [counsel] from assisting the accused" during the prosecutor's closing argument *in any way* constitutes structural error, thus the state court "contravened" that rule.[16]  AOB 45-48.  However, an examination of the Supreme Court's Sixth Amendment jurisprudence demonstrates that the phrase is not as self-evident or absolute as Knoller would have it—and more to the point, it is reasonably amenable to much more than the single, narrow interpretation she ascribes to it.  Rather, "the *Cronic* court has only carved out a broad rule," *Caver v.*

---

[16] Although Knoller argues in some of her headings that the state appellate court's ruling was "unreasonable," her main argument with regard to the structural error issue appears to be that the ruling was "contrary to the Supreme Court's decision in *Cronic* within the meaning of § 2254(d)(1)." AOB 48.

*Straub*, 349 F.3d 340, 350 n.7 (6th Cir. 2003), and "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). As shown below, the "precise contours" of *Cronic*'s language are unclear, demonstrating that the state appellate court's interpretation of it was not beyond any possibility for fairminded disagreement.

First, in *Herring v. New York*, 422 U.S. 853 (1975), the Supreme Court held that "the *total denial* of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense." *Id*. at 859, emphasis added. In that case, the trial court invoked a state law that barred defense counsel from delivering closing argument in a bench trial. The Court held that there was no justification for a statute that allowed the trial court to "deny *absolutely* the opportunity for *any closing summation at all*." *Id*. at 863, emphasis added. Accordingly, the Court made clear that the structural error in that case stemmed from the complete denial of the assistance of counsel at closing argument.

The Supreme Court recently underscored this conclusion in *Glebe v. Frost*, 135 S.Ct. 429. This Court had held that the state court unreasonably applied *Herring* when it failed to classify as structural error the trial court's requirement that defense counsel limit closing argument to one of two

42

alternative theories. The Supreme Court reversed, stating, "even assuming that *Herring* established that *complete denial* of summation amounts to structural error, it did not clearly establish that the *restriction* of summation also amounts to structural error." *Id.* at 431, emphasis in original. Further, the Court found that it was reasonable for the state court to conclude that prohibiting all argument differs from prohibiting argument in the alternative, which was "all the more true because our structural-error cases 'ha[ve] not been characterized by [an] "in for a penny, in for a pound" approach.'" *Id.*, citation omitted. The Court noted that structural errors are limited to those "rare" instances that infect the entire trial process and necessarily render the trial unfair, and that no Supreme Court precedent clearly required placing the improper restriction of closing argument into this "narrow category." *Id.*

Here, the state appellate court concluded that this case "differs significantly from those rare cases that have reversed for structural error as the truth-seeking or adversarial process was not significantly frustrated. Ruiz was not precluded from giving any part of her closing argument," as was the case in *Herring*. ER 138. That distinction, which predated *Glebe v. Frost* but used almost identical language, was clearly reasonable. Moreover, if a restriction on defense counsel's *own* closing argument is not structural error, then the very different restriction on defense counsel's ability to object

43

during the *prosecutor's* closing argument cannot be structural error. *See White v. Woodall,* 134 S.Ct. 1697, 1706 (2014) ("if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision"); *Premo v. Moore*, 562 U.S. 115, 127 (2011) ("novelty alone—at least insofar as it renders the relevant rule less than 'clearly established'— provides a reason to reject it under AEDPA").

Next, in *United States v. Cronic*, 466 U.S. 648, the Supreme Court rejected the circuit court's finding that the defendant did not have the "assistance of counsel" required by the Sixth Amendment, where his appointed attorney was handling his first criminal trial and had only 25 days to prepare for a complex fraud case, but the court identified no specific deficiency in his representation. In the course of its discussion, the Supreme Court observed that circumstances could arise that were "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id*. "Most obvious, of course, is the *complete denial* of counsel." *Id*. at 659, emphasis added. The Court viewed such a circumstance as arising "if the accused is denied counsel at a critical stage of his trial," "if counsel entirely fails to subject the prosecution's case to

meaningful adversarial testing," or if it was unlikely that any lawyer could provide effective assistance under the circumstances. *Id.* at 659-660.[17]

Knoller zeroes in on one footnote in *Cronic*, where the Supreme Court stated, "The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25. However, the phrase "prevented from assisting the accused" cannot be divorced from the rest of the opinion. *Fry v. Pliler*, 551 U.S. at 118 (rejecting petitioner's claim because it "exaggerates the significance of a lone passage from our *Brecht* opinion," without acknowledging the rest of the opinion and other relevant precedents). In the text before the footnote, the Court described the kind of error it viewed as

---

[17] As the district court found, because *Cronic* itself did not involve a denial of the assistance of counsel, its discussion of the circumstances that might qualify as structural error on that basis was dicta. ER 24; *accord Commonwealth v. Molina*, 909 N.E.2d 19, 28 (Mass. 2009); *State v. Brown*, 903 A.2d 169, 180 (Conn. 2006); *People v. Snow*, 30 Cal.4th 43, 117 (2003); *Haynes v. Cain*, 298 F.3d 375, 384 (5th Cir. 2002) (en banc) (Dennis, J., concurring); *Redman v. State*, 768 A.2d 656, 663 (Md. 2001); *United States v. Ademaj*, 170 F.3d 58, 62 (1st Cir. 1999); *Wisehart v. State*, 693 N.E.2d 23, 56 (Ind. 1998); *Scarpa v. Dubois*, 38 F.3d 1, 12-15 (1st Cir. 1994); *People v. Valdez*, 789 P.2d 406, 410 (Colo. 1990); *Hammonds v. Newsome*, 816 F.2d 611, 613 (11th Cir. 1987); *Takacs v. Engle*, 768 F.2d 122, 124 (6th Cir. 1985). For purposes of AEDPA, dicta does not qualify as "clearly established" Supreme Court law. *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

structural as the "complete denial of counsel;" in the next footnote it cautioned that only "circumstances of that magnitude" would justify reversal without showing how the trial was unreliable; and in a subsequent footnote it pointed out that even an "external constraint" imposed by the trial court on counsel does not amount to structural error. *Cronic*, 466 U.S. at 659 & nn. 26, 31. Thus, read in full, the opinion in *Cronic* does not support Knoller's reading of the phrase as requiring automatic reversal if counsel's assistance has been limited in any way.

Further, none of the seven cases cited in footnote 25 to illustrate the Supreme Court's point involved anything comparable to the mere limitation on counsel's ability to object to the prosecutor's argument. *Geders v. United States,* 425 U.S. 80 (1976) (counsel prevented from communicating with defendant before his testimony); *Herring*, 422 U.S. 853 (counsel prevented from giving closing argument); *Brooks v. Tennessee*, 406 U.S. 605 (1972) (law requiring defendant to testify first or not at all deprived him of the "guiding hand of counsel"); *Hamilton v. Alabama*, 368 U.S. 52 (1961) (no counsel at arraignment); *White v. Maryland*, 373 U.S. 59 (1963) (per curiam)

46

(no counsel at preliminary hearing);[18] *Ferguson v. Georgia*, 365 U.S. 570 (1961) (statute prevented defendant from testifying by examination, which deprived him of the "guiding hand of counsel"); *Williams v. Kaiser*, 323 U.S. 471, 475-476 (1945) (indigent defendant's request for counsel denied). The state appellate court reviewed those cases and found that the situation before it did not approximate any of them, because here there was no "actual or constructive, *complete* denial of counsel." ER 135-137, emphasis in original. Given the Supreme Court's indication that the denial of counsel must be complete before an error may be considered structural, the state appellate court's restrictive reading of the scope of footnote 25 was not unreasonable. *See Florida v. Nixon*, 543 U.S. 175, 189-190 (2004) ("*Cronic* recognized a narrow exception" to the general requirement of prejudice that was "reserved for situations in which counsel has entirely failed to function as the client's advocate"); *Smith v. Brown*, 764 F.3d 790, 796 (7th Cir. 2014) (state court reasonably declined to presume prejudice because the "*Cronic* exception is exceedingly narrow"); (*Fusi v. O'Brien*, 621 F.3d 1, 7 (1st Cir. 2010) ("Supreme Court precedent dictates our narrow application of the

---

[18] Subsequently, in *Coleman v. Alabama*, 399 U.S. 1, 10-11 (1970), the Supreme Court held that even where a defendant did not have counsel at the preliminary hearing, if no evidence from that hearing that was used at trial, the denial of counsel was subject to harmless error analysis.

*Cronic* presumption of prejudice."); *Toomey v. Bunnell*, 898 F.2d 741, 744 n.2 (9th Cir. 1990) (*Cronic* rule should be applied "very sparingly").

In *Bell v. Cone*, 535 U.S. 685 (2002), the Supreme Court reinforced this conclusion, stating, "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' *Cronic, supra*, at 659 (emphasis added)." *Id.* at 697. Although in *Bell* defense counsel had waived closing argument entirely at the penalty phase of a capital case, the Supreme Court rejected the circuit court's holding that the state court was required to find structural error under *Cronic*, because the challenges raised to counsel's performance were "plainly of the same ilk" as other attorney errors that required a showing of prejudice. *Id.* at 697-698. Thus, in *Bell* the Supreme Court clearly signalled that it intended *Cronic*–type structural error to apply only when the right to counsel is totally abridged. Applying this principle, the state appellate court held, "Under *Cronic* and *Bell* prejudice is presumed only under the most egregious conditions. Prejudice is presumed when the state interferes to the extent there is a complete deprivation of counsel during a critical stage of the proceeding." ER 135. That interpretation of Supreme Court law was clearly

reasonable. *Lockett v. Trammel*, 711 F.3d 1218, 1248 (10th Cir. 2013) (in *Bell* the Supreme Court "emphasized the narrow application of *Cronic*"); *Miller v. Martin*, 481 F.3d 468, 473 (7th 2007) ("In the wake of *Bell*, courts have rarely applied *Cronic*"); *Visciotti v. Woodford*, 288 F.3d 1097, 1106 (9th Cir. 2002), rev'd on other grounds, 537 U.S. 19 ("*Cronic* and the cases that follow *Cronic* have made clear that this exception is limited to the 'complete denial of counsel' and comparable circumstances"). Thus, Knoller's argument, that "to construe *Bell* as limiting the reach of the *Cronic* rule is patently unreasonable," AOB 50, is simply wrong.

In *Wright v. Van Patten*, 552 U.S. 120 (2008) (per curiam), the Supreme Court again reaffirmed the limited scope of *Cronic*. The circuit court had found that counsel's appearance by speakerphone at a change of plea hearing amounted to structural error under *Cronic*. *Id*. at 124. The Supreme Court reversed, finding that no Supreme Court decision "squarely addresses" the issue in this "novel factual context," as no case clearly established that participation by speakerphone should be treated as a "'complete denial of counsel,' on par with total absence," such that *Cronic* required automatic reversal. *Id*. at 125. Justice Stevens concurred, noting that the question was not whether the circuit court had correctly interpreted *Cronic*, but whether the state court's "narrower reading" of *Cronic* was

49

objectively unreasonable. Although he indicated he would not agree with that reading if the case had arisen on direct review, "[i]n light of *Cronic*'s references to the 'complete denial of counsel' and 'totally absent' counsel," the state court's decision was not an unreasonable application of clearly established Supreme Court law. *Id*. at 128-129 (Stevens, J., concurring).

The limitation on the scope of structural error under *Cronic* was recently confirmed yet again in *Woods v. Donald,* 135 S.Ct. 1372. The circuit court had found that *Cronic* applied where defense counsel was briefly absent from a joint trial during testimony implicating the codefendants. The Supreme Court reversed because none of its cases had confronted the "specific question" presented by this case, and circumstances that were only "similar to" its precedents did not show that the state court's decision was contrary to clearly established Supreme Court law. *Id.* at 1377. The Court also acknowledged that the "precise contours" of *Cronic* were unclear, which allowed the state court broad discretion to determine whether it was applicable. *Id.* The Court stated, "All that matters here, and all that should have mattered to the Sixth Circuit, is that we have not held that *Cronic* applies to the circumstances presented in this case. For that reason, federal habeas relief based upon *Cronic* is unavailable." *Id.* at 1378.

50

Therefore, the state court's refusal to apply *Cronic* "was not the 'extreme malfunction' required for federal habeas relief." *Id.*

All of the above cases point unerringly to a conclusion that no extreme malfunction occurred here either. The state appellate court stated, "We know of no case holding that limiting an attorney's role or ability to object during a portion of the closing argument results in prejudice per se." ER 141. Knoller cites no such case, and argues instead that the state court was required to read the *Cronic* footnote in the broadest manner possible in order to reach the novel factual situation presented here. As the foregoing demonstrates, fairminded jurists could disagree with that proposition, which forecloses habeas relief. *See Castillo v. Florida*, 722 F.3d 1281, 1289 (11th Cir. 2013) ("Allowing an attorney's failure to object to a constitutional or otherwise important error to warrant a presumption of prejudice would run counter to a wall of binding precedent from *Strickland* forward; it would obliterate the complete-denial and total-failure elements of *Cronic*'s first two exceptions; and it would significantly stretch *Cronic*'s deliberately narrow exceptions to swallow *Strickland*'s general rule."). Thus, as there was a "principled reason" for the state appellate court to distinguish this case from *Cronic*, its decision was not contrary to or an unreasonable application of

clearly established Supreme Court law.  *See Murdoch v. Castro*, 609 F.3d 983, 992 (9th Cir. 2010) (en banc).

Knoller also contends the state appellate court improperly used an "implied new test" based on *Arizona v. Fulminante,* 499 U.S. 279 (1991) and its progeny that was "disapproved" in *United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006).[19]  AOB 50-54.  Not so.  Because the "precise contours" of *Cronic* are unclear, it was appropriate for the state appellate court to consider the purpose and parameters of the structural error rule in determining whether *Cronic* applied to this case.  The state appellate court relied on the seminal Supreme Court cases holding that structural errors are those that contain a defect that affects the framework within which the trial proceeds, rather than an error in the trial process itself, which thus necessarily renders the trial fundamentally unfair.  ER 134, quoting *Neder v. United States,* 527 U.S. 1, 8-9 (1999); ER 140-141, quoting *Fulminante*, 499 U.S. at 307, 309-310.  The state appellate court rejected Knoller's contention that *Gonzalez-Lopez* had disapproved of that approach or changed the

---

[19] Knoller also relies on a discussion in *Musladin v. Lamarque*, 555 F.3d 830, 836 (9th Cir. 2009).  However, the issue in that case was whether counsel was abridged at a "critical stage" of trial, which is not at issue here.

52

harmless error analysis for ensuring a fair trial under the Sixth Amendment. ER 136. That conclusion was clearly correct.

In *Gonzalez-Lopez*, 548 U.S. 140, the Supreme Court held that the erroneous denial of *counsel of choice* constituted structural error. That right does *not* derive from the Sixth Amendment's purpose of ensuring a fair trial, but from the "root meaning" of the constitutional guarantee of counsel; thus, a deprivation is "'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants." *Id*. at 147-148. The Court cited *Fulminante* and *Neder* in concluding that the error was structural because it defied analysis by harmless error standards and affected the framework within which the trial proceeds. *Id*. at 148-149. The Court noted that fundamental unfairness was not the only criterion it had used in determining whether error was structural, but in no way disavowed the use of that test in an appropriate case. *Id.* at 149 n.4.[20] Accordingly, it was reasonable for the state appellate court to find that Knoller's interpretation of *Gonzalez-Lopez* was "simply not correct." ER 136.

---

[20] The Supreme Court has used the fundamental unfairness standard of structural error in at least four cases following *Gonzalez-Lopez*. *Glebe v. Frost*, 135 S.Ct. at 430-431; *Rivera v. Illinois*, 556 U.S. 148, 161 (2009); *Puckett v. United States*, 556 U.S. 129, 141 (2009); *Washington v. Recuenco*, 548 U.S. at 218-219.

Knoller also criticizes the state appellate court for noting that the trial court had the authority to control the courtroom. AOB 44. She again relies primarily on attorney contempt cases, which the state appellate court found had only limited applicability. ER 139-140. On federal habeas review, this Court has no authority to transpose a nonconstitutional decision regarding contempt proceedings into binding precedent for purposes of a Sixth Amendment claim. *See Premo v. Moore,* 562 U.S. at 127-128 (Supreme Court case that discussed improper use of confession did not clearly establish law governing ineffective assistance of counsel claim); *see also Early v. Packer*, 537 U.S. 3, 10 (2002) (per curiam) (Supreme Court opinions that are not based on constitutional grounds are "off the table as far § 2254(d) is concerned").

**C.    The State Court Reasonably Concluded that No Prejudicial Prosecutorial or Judicial Misconduct Occurred**

**1.    Prosecutor's Closing Argument**

At issue are the following remarks made by the prosecutor after the trial court's second admonition to defense counsel:

> Last thing I want you to think about, please, because this is a murder case and you try to recreate Diane Whipple's time in that hallway, what is it she saw before that first bite? . . . [¶]  Mr. Noel writes "Before I could get my body in the doorway to block them, they pushed

54

forward into the hall and took off side by side down the hall toward the elevator in a celebratory stampede." Think of Diane. "240 pounds of Presa wall-to-wall bouncing off and heading for the wall at the end of the hall." Exactly where Diane was standing before she was bitten by these dogs.

Think about the ten minutes that she was ripped to death and her clothes ripped off her and then think about this because this is how she died because of their recklessness. Every time she tried to breathe, think of a breath in. Every time she tried to breathe, her throat closed in on itself, every time. And she crawled, this young woman despite her . . . try to get home and she tried to breathe again and her throat closed in again. She tried to breathe again and she was alone, she was alone unable to even talk. And the dog was still running loose with her and she tried to breathe again, and her voice closing down with two holes in her larynx and she crawled and she tried to push herself up and she crawled some more to try to get home and no one was there, no one. That's what these people's recklessness did, caused that kind of death.

ER 464-465.

A prosecutor's closing argument rises to the level of a constitutional violation only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted); *accord Parker v. Matthews*, 132 S.Ct. 2148 (2012). In *Darden*, the prosecutor made "offensive comments"

during closing argument,[21] which the Supreme Court held were improper but did not amount to a due process violation, because the trial court instructed the jurors that the arguments of counsel were not evidence and the evidence clearly supported a finding of guilt. *Id*. at 182; *Runningeagle v. Ryan*, 686 F.3d 758, 781-782 (9th Cir. 2012) (state court reasonably found no due process violation where prosecutor described the crime as an "unspeakable horror" and the defendant as "the evil. . . among us"); *Allen v. Woodford*, 395 F.3d 979, 997 (9th Cir. 2004) (prosecutor's description of "what Allen's victims would say from beyond the grave" did not violate due process); *Drayden v. White,* 232 F.3d 704, 712-713 (9th Cir. 2000) (prosecutor's "soliloquy in the voice of the victim," though "misconduct" and "deplorable," did not violate due process).

Nothing in the prosecutor's argument here came close to the offensive comments made in *Darden*. The state appellate court reasonably concluded that the prosecutor's argument that Knoller abandoned Whipple, who was

---

[21] The prosecutor called defendant an "animal;" said he "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash;" expressed a desire to "see him sitting here with no face, blown away by a shotgun;" and noted that the defendant had changed his appearance prior to trial, including his hair, goatee, moustache, and weight; "The only thing he hasn't done that I know of is cut his throat." *Darden*, 477 U.S. at 180-181, nn. 11, 12.

left alone and grievously injured in the hallway, was proper because it helped establish Knoller's disregard for human life. The court found that the prosecutor's discussion of the severity of Whipple's injuries was "particularly relevant" to rebut Knoller's claim that she tried to help Whipple. ER 144. The court did find that the prosecutor's invitation to "think" of Whipple amounted to an appeal to view the case through the victim's eyes instead of viewing the evidence objectively, and that to the extent those remarks appealed to the jury's passion and prejudice, they were improper. However, the court determined that those "few comments" were harmless beyond a reasonable doubt, because they "primarily focused on the evidence;" the court instructed the jury not to be swayed by sympathy, passion, or prejudice in reaching its verdict; and the evidence against Knoller was strong. ER 145.

The state appellate court's *Chapman* analysis was not objectively unreasonable, and the same factors it cited in that discussion also demonstrate that the remarks could not have had a substantial or injurious effect on the verdict under the *Brecht* test. *See Davis v. Ayala,* 2015 U.S. LEXIS 4059, *21. The prosecutor's comments essentially restated what was obvious from the evidence, that Whipple suffered a horrendous and shocking attack by Knoller's dogs. Ruiz herself used the phrase "tragic death" so

many times that she was admonished by the court not to do so anymore. RT

5090. *See Drayden v. White*, 232 F.3d at 713 (prosecutor's statements

during closing argument in the voice of the victim, though improper, were

supported by the evidence, and would have been proper if the exact same

speech had been delivered in the third person). Weighed against the entire

six-week trial in this case, the prosecutor's brief comments—which

comprised only two paragraphs of his 77-page opening and rebuttal

arguments—were not so inflammatory that they caused the jury to convict

without any regard for the evidence or the law. *See Darden* at 645 (no

constitutional error where prosecutor's offensive statement "was but one

moment in an extended trial"); *Brecht,* 507 U.S. at 639 (no prejudice where

prosecutorial misconduct comprised less than two pages of 900-page trial

transcript); *People v. Stansbury*, 4 Cal.4th 1017, 1057 (1993) (no prejudice

resulted from prosecutor's argument, "Think what she must have been

thinking in her last moments of consciousness during the assault. Think of

how she might have begged or pleaded or cried," because "this was but a

single reference in a long, complex and otherwise scrupulous argument

about the facts of the case").[22]

---

[22] Knoller cites *People v. Vance,* 188 Cal.App.4th 1182 (2010), but, as

(continued…)

In addition, the trial court instructed the jury that the arguments of counsel are not evidence immediately after Ruiz's second objection, ER 461, and again before deliberations. CT 4611, 4612. The court also specifically instructed the jury, "You must not be influence by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and a defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict regardless of the consequences." CT 4609. This Court must presume that the jury followed these instructions. *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions. . . . in all cases, juries are presumed to follow the court's instructions."); *see Boyde v. California*, 494 U.S. 370, 384 (1990) ("arguments of counsel generally carry less weight with a jury than do instructions from the court"). Accordingly, the instructions served to deflect any possible prejudice from the prosecutor's comments. *Runningeagle v.*

---

(…continued)

the district court found, ER 31, that case is clearly distinguishable because "the sheer number of the instances of prosecutorial misconduct" was "profoundly troubling;" the trial court refused to admonish the jury to disregard the improper comments; and the evidence of guilt of first degree murder was "teetering on a knife edge." *Id.* at 1206-1207.

*Ryan*, 686 F.3d at 781; *Allen v. Woodford*, 395 F.3d at 997; *Drayden v. White,* 232 F.3d at 713.

Finally, Knoller contends that she was prejudiced because it was "virtually impossible" to demonstrate implied malice, based on her now-discredited view of what she believes California law required (although she conspicuously did not raise a constitutional claim of insufficient evidence to sustain the conviction).[23]  AOB 1, 15-20, 60-61.  However, the jury, the trial court on remand, the unanimous 2010 California Court of Appeal opinion, and the district court found that there was "clear, substantial and credible" evidence of implied malice to support second degree murder.  ER 29-30, 121-122.  Even the 2005 dissenting judge acknowledged that if Ruiz had

---

[23] For example, Knoller insists that implied malice required a showing that her dogs had killed someone before they killed Whipple.  AOB 19, 60-61.  She made the identical argument in her briefing before the California Supreme Court.  *Compare* AOB 15-19 *with* CR 15, Exh. 11 at 23-27, 32-37.  The California Supreme Court rejected that argument, and held that "implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less."  *People v. Knoller*, 41 Cal.4th at 143.  Thus, that question of state law is now settled, and, as the California Court of Appeal found, a prior death is not necessary under this standard.  The appellate court noted that in the context of second degree murder based on drunk driving, the courts have held that prior "near misses" or minor collisions are sufficient to place a defendant on notice that his conduct is life-threatening.  ER 111.  Accordingly, as the prosecutor stated in closing argument, "You don't get a free mauling, you don't get a free death to be put on notice what these dogs could do."  ER 367.

objected to the prosecutor's comments and the court had sustained the

objection and admonished the jury, "I readily concede that the odds the jury

would have then returned a different verdict as to Knoller are long indeed."

ER 291.  Knoller also relies on the view expressed by the trial judge when

he granted a new trial on the second degree murder charge.  AOB 61-62.

Because the California Supreme Court held that the order granting a new

trial was based on the judge's "inaccurate definition of implied malice,"

*People v. Knoller,* 41 Cal.4th at 156, that overruled opinion is irrelevant.[24]

 The evidence of guilt was summarized by the district court as follows:

> Supporting the guilty verdict was voluminous testimony
> that Knoller's dogs had lunged at, attacked, and bitten
> other people and dogs in her presence, sometimes
> causing serious injury, that Knoller had been warned
> that these dogs had no training and had in the past killed
> sheep, that the dogs were, in the words of a veterinarian,
> a "liability," reminding him of a recent attack in which
> a boy had lost his arm and had his face disfigured, that
> Knoller could not, and often did not control the dogs,
> that Knoller was entirely unresponsive to complaints
> about her dogs and acted in "disregard of the danger"
> they posed, and that after her dogs mauled Ms. Whipple
> to death, Knoller failed to call 911 or otherwise seek

---

[24] As the appellate court noted, the trial judge did not find that the
evidence was legally insufficient to support the verdict; if he had, he would
have acquitted Knoller of second degree murder as a matter of law, instead
of granting a new trial.  The trial judge also denied Knoller's motion to
dismiss for insufficient evidence under Cal. Pen. Code § 1118.1.  ER 107-
108.

> help, and did not inquire into Ms. Whipple's condition
> despite returning to the scene of the killing to retrieve
> her apartment keys.

ER 29-30.

In addition, as the state appellate court noted, Knoller had read the literature in her possession warning that Presa Canario dogs were bred for combat and guarding, they were naturally very dog aggressive, they could kill if not properly socialized, and they were fiercely protective of their owners; one article equated them to a "loaded gun." ER 110-111. Also, "the witnesses described over 30 incidents where Bane and/or Hera lunged, snapped, and growled at people or physically attacked other dogs in a period of months. [Knoller] also observed the damage done by Bane's jaws when she saw that a single bite from Bane required Noel to remain in the hospital for four days and have two steel pins placed in his hand." ER 111-112. A letter by Noel described an incident where Knoller was dragged down the hallway by the dogs and had to let go of their leashes to keep her footing; a letter by Knoller admitted she did not have the upper body strength to stop Bane if he were to go after another dog; and Knoller admitted at trial that she could not physically control both dogs at the same time. The state appellate court concluded that Knoller's "deliberate act of leaving her apartment with an unmuzzled Bane knowing that she could not control him, as well as the

evidence that she knew he was dangerous to human life, provided substantial support for the jury's finding that she acted with conscious disregard for human life." ER 112. Knoller's suggestion that something more was required was rejected by the state courts, whose interpretation of California law is binding on this Court. *See Hicks v. Feiock,* 485 U.S. 624, 629 (1988); *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979).

Therefore, in light of the compelling evidence of implied malice under the correct legal standard, along with all the other circumstances discussed above, the state court's conclusion that any error was harmless under *Chapman* was not beyond any possibility for fairminded disagreement, and the error was also clearly harmless under the *Brecht* standard. *People v. Leonard*, 40 Cal.4th 1370, 1407 (2007) (given the overwhelming evidence of guilt, no prejudice resulted from prosecutor's argument, "imagine yourself, put yourself there. . . imagine in that last millisecond before the lights go out, when you hear the report of the gun, when you feel the wetness. . . the small vapor of blood that is blown out the back or the side of their head and they fall to the floor"); *People v. Fields*, 35 Cal.3d 329, 362 (1983) (no prejudice resulted from prosecutor's argument to "think of yourself as [the victim]," where evidence of guilt was overwhelming); *see*

63

*Brecht*, 507 U.S. at 639 (prosecutorial misconduct was harmless because "the State's evidence of guilt was, if not overwhelming, certainly weighty").

### 2. Trial Court's Comments

Knoller also contends the trial court's comments about Ruiz were prejudicial because they implied that the court believed Ruiz "was not to be trusted in her own summation of the evidence." AOB 58. The California Court of Appeal disagreed, stating that judicial misconduct occurs only if the judge "*persistently* makes discourteous or disparaging remarks so as to discredit the defense." ER 146, emphasis in original. It found that the trial court here did not exhibit a persistent antagonism toward Ruiz and indeed was "rather tolerant" toward her. ER 147; *see* ER 139 n.27 (trial court "exhibited significant patience in dealing with defendant's counsel"). "At most, the trial court improperly became angry when it perceived Ruiz as being disruptive," but it did not commit misconduct simply by evidencing irritation with counsel or admonishing her in the jury's presence. Thus, the state appellate court found the error harmless beyond a reasonable doubt. ER 147-148; *accord* ER 32-33 (district court found trial court's comments harmless under *Brecht*).

The state court's *Chapman* analysis was reasonable, and any error was also harmless under *Brecht*. "[J]udicial rulings alone almost never constitute

a valid basis for a bias or partiality motion," and "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id*. at 555-556, emphasis in original. The notion that the trial court's comments conveyed the impression that the jury should find Ruiz's entire closing argument untrustworthy is tenuous at best. Further, in the context of the entire trial and the strong evidence of guilt, the court's comments were harmless under any standard. Habeas relief is unwarranted.

## CONCLUSION

Respondent respectfully requests that the judgment be affirmed.

65

Dated:  July 9, 2015            Respectfully submitted,


KAMALA D. HARRIS
Attorney General of California


s/ PEGGY S. RUFFRA
PEGGY S. RUFFRA
Supervising Deputy Attorney General
*Attorneys for Respondent-Appellee*

SF2014409109
41278325_2.doc

66

14-16449

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**MARJORIE KNOLLER,**

Petitioner-Appellant,

**v.**

**WALTER MILLER, Warden,**

Respondent-Appellee.

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated: July 9, 2015

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California

s/ PEGGY S. RUFFRA
PEGGY S. RUFFRA
Supervising Deputy Attorney General
*Attorneys for Respondent-Appellee*

67

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR 14-16449

I certify that: (check (x) appropriate option(s))

[ ]  1. Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **opening/answering/reply/cross-appeal** brief is

[ ]  Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

[ ]  Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

[ X ]  2. The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a(7)(B) because

[ ]  This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

[ X ]  This brief complies with a page or size-volume limitation established by separate court order dated June 19, 2015 and is 16,505 words.

[ ]  Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

[ ]  Monospaced, has 10.5 or fewer characters per inch and contains __ pages or __ words or __ lines of text.

[ ]  3. Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

[ ]  Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

[ ]  Monospaced, has 10.5 or fewer characters per inch and contains __ words or __ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐    4. **Amicus Briefs**.

☐    Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐    Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐    Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

| | |
|---|---|
| July 9, 2015 | s/ Peggy S. Ruffra |
| Dated | Peggy S. Ruffra |
| | Supervising Deputy Attorney General |

# CERTIFICATE OF SERVICE

Case Name:   **Marjorie Knoller v.**              No.   **14-16449**
             **Walter Miller**

I hereby certify that on <u>July 9, 2015</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**APPELLEE'S BRIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>July 9, 2015</u>, at Sacramento, California.

<table>
<tr><td>N. Newlin</td><td>s/ N. Newlin</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

32065708_2.doc